John K. Crossman (JKC 7387)
Jeffrey D. Zukerman (JDZ 3796)
Frank C. Welzer (FCW 7159)
ZUKERMAN GORE & BRANDEIS, LLP
875 Third Avenue
Twenty-Eighth Floor
New York, New York 10022
212.223.6700

*Attorneys for Plaintiff Edward M. Sullivan*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------
EDWARD M. SULLIVAN,

               Plaintiff,

    -  against  -

JEFFREY BRODSKY, ERIC KAYNE,
and MORGAN STANLEY,

             Defendants.
-------------------------------------------------

Civil Action No. 07-CV-03 (BSJ)
ECF Case

**COMPLAINT and**
**JURY DEMAND**

     Edward M. Sullivan, for his complaint against certain defendants for Age

Discrimination, Defamation, and Tortious Interference with Contract and with

Prospective Contractual Relations, alleges on personal knowledge as to his own acts and

on information and belief as to the acts of others, as follows:

     1.     In the fall of 2005, Jeffrey Brodsky wanted very much for someone to fire

Edward Sullivan, who had just turned fifty-five. Both men worked at Morgan Stanley --

Brodsky as one of the firm's most senior Human Resources executives, and Sullivan as a

Managing Director. Brodsky had marked the aging Mr. Sullivan for termination despite

Sullivan's distinguished, highly-acclaimed, twenty-five year career. He wanted Sullivan

terminated even though there was no reason to terminate him, and he wanted it done now, before Sullivan got any older.

2.      But things were not looking good for Brodsky's plan. For decades, Sullivan had consistently received glowing reviews – reviews which had been gleaned from Sullivan's peers, subordinates, and superiors, all in accordance with Morgan Stanley's "360 degree" evaluations and its much-touted pursuit of a "culture of excellence." As the evaluation process for 2005 was working towards completion, it was looking like the review for Sullivan would be another strong one.

3.      In response, Brodsky decided to act. He enlisted the help of Eric Kayne, another HR executive, and together the two men set about to do something totally unprecedented and utterly contrary to universal Morgan Stanley policy: they would undermine the firm's longstanding evaluation process by interfering with the compilation of Sullivan's review. In particular, they would substitute their own made-up poison-pen critique of Sullivan in place of the legitimate evaluations of him, in order to create a paper trail upon which he would be fired. For this purpose, Brodsky and Kayne together launched a deliberate smear campaign against Sullivan and wrote and submitted evaluations of him even though in the normal course of business, neither Brodsky nor Kayne would have reason to prepare such evaluations. In the process, Brodsky and Kayne exceeded the bounds of their jobs and their authority by, for example, creating false, defamatory statements about Sullivan's job performance, and strong-arming senior managers into incorporating those false statements into Sullivan's review. Not stopping there, Brodsky and Kayne then also improperly injected themselves into the compensation-setting process. Using intimidation, they forced Morgan Stanley executives

to deprive Sullivan of monies he would otherwise have received, all with the result that Sullivan was forced out of his position based upon the poisonous lies of Brodsky and Kayne.

4.    Thus, in the power vacuum which resulted from the transition from John Schaeffer to James Gorman as President of Morgan Stanley, Defendants Brodsky and Kayne (collectively and on information and belief in concert with others, "Brodsky-Kayne") took advantage of the resulting lack of oversight to sharpen their knives and go well beyond their job descriptions to become not only the source of vicious lies about Sullivan, but also the force which compelled executives to adopt those lies – by insinuating that if they did not comply, those executives would become the target of similar treatment themselves.

## Parties

5.    Plaintiff Edward Sullivan is a 56 year old individual who resides in the State of Connecticut.

6.    On information and belief, Defendant Jeffrey Brodsky is an individual residing in the state of New Jersey.

7.    On information and belief, Defendant Eric Kayne is an individual residing in the state of New Jersey.

8.    Defendant Morgan Stanley is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

## Jurisdiction and Venue

9.    This Court has jurisdiction over the subject matter of this complaint pursuant to 29 U.S.C. § 626(c)(1), 28 U.S.C. § 1331, and 28 U.S.C. § 1337, and

principles of pendent and supplemental jurisdiction, 28 U.S.C. § 1367. Venue is proper

in this district as Defendant Morgan Stanley resides in this district. Jurisdiction is also

independently proper under 28 U.S.C. § 1332 insofar as there is complete diversity of

citizenship and the amount in controversy exceeds $75,000.00.

10.    On December 11, 1981, Sullivan began work at Morgan Stanley's Dean

Witter operation as a Branch Manager for Burlington, Vermont. Thereafter, he worked

continuously for Morgan Stanley and was promoted repeatedly, rising eventually to the

position of Executive Vice President and then Managing Director, which position he held

from 1999 until May of 2006, when he was terminated.

11.    Over the years of his service at Morgan Stanley, up until the acts about

which he now complains, Sullivan consistently received outstanding reviews from

supervisors, peers, and subordinates. In all that time, there was never an occasion for any

substantial criticism of his work

12.    Until the acts about which he now complains, Sullivan received a substantial

bonus in every year he was employed at Morgan Stanley. Sullivan's annual

compensation in the five (5) years preceding was between $800,000 and $1,000,000 for

each year.

13.    Until the acts about which he now complains, Sullivan received numerous

pay raises.

14.    For the years immediately preceding his termination, Sullivan's business

group had the lowest rate of litigation expenses of any region in the entire Retail Division

of Morgan Stanley.

15.    Sullivan's region was the 2005 winner of the Morgan Stanley Moneyball exercise. The Moneyball award is given to the Morgan Stanley business group which demonstrates the highest performance in terms of risk, control, and legal expense. At the Regional Risk Forum held in Boston in September of 2005, as part of Sullivan's region winning the Moneyball award, Morgan Stanley's General Counsel of Global Wealth Management, Kirk Wickman, publicly praised and congratulated Sullivan and all of the managers in Sullivan's region.

16.    Also at that September of 2005 Regional Risk Forum, Sullivan was the lead-off speaker for the forum, which was attended by managers from his entire region. These regional forums were organized by Morgan Stanley as a response to the firm as a whole having developed a poor reputation with regulators in prior years, and the forums were intended to begin to improve that reputation, for example by promoting awareness and responsiveness to issues concerning risk to the organization, including so-called "guardianship" type issues. Sullivan's remarks to this gathering were considered by Morgan Stanley to be so on-point, valuable and informative that he was told that his remarks would be used in the Risk Forums held for every other Region in the country. Sullivan's leadership on the subject of guardianship was thus recognized by Morgan Stanley and offered as a role model for others in the organization.

17.    Also at the Regional Risk Forum, then acting President Ray Harris told the assembled group that "Sullivan was one of the best Regional Directors at the firm."

18.    Sullivan's commitment to the Regional Risk Forum was so extensive that he unilaterally took the initiative to hold his own related forum for his administrative staff at the same time in the same place. Administrative staff had not been included in the

Regional Risk Forum arranged by the National Risk Forum organizers, and Sullivan felt that it was important that his staff be given the same opportunity and training regarding such issues. His initiative and dedication enabled his Administrative staff to benefit from a similar program. No other region did this.

19.     In the 2005 evaluation season at Morgan Stanley, except for Defendants and those acting under their control and compulsion, all of the reviewers of Sullivan submitted excellent reviews of his performance. Sullivan's direct supervisor sought to complement Sullivan in the 2005 review season, and to ensure that the tenor of Sullivan's review was highly positive, constructive, and desirable.

20.     On information and belief, in the Fall of 2005, Defendants Brodsky and Kayne conspired together and concluded amongst themselves that they both wanted Sullivan terminated immediately.  The circumstances of this decision support the conclusion that this decision was age-based.

21.     As an additional reason for Brodsky's participation in the scheme alleged herein, Brodsky had a friend named Todd Taylor who also worked for Morgan Stanley but who was younger than Sullivan and who was then without an assignment. Brodsky targeted the older Sullivan as someone he could force out by improper means, thereby creating room for his friend, Todd Taylor, to take up a position.

22.     In another company, the ill will of Brodsky and Kayne might have resulted in no more than garden-variety corporate infighting. But at Morgan Stanley in the Summer through the Winter of 2005, a gaping leadership vacuum had been created at the very top of Morgan Stanley's organization as a result of the announcement of John Mack's imminent return to power, the lack of a permanent president, and an overarching

atmosphere of fear and intimidation. Brodsky and Kayne were instrumental in creating that atmosphere and were noteworthy for taking some of the most extraordinary liberties as a result of the lack of supervision.

23.    Although as part of their scheme, Brodsky and Kayne cloaked themselves in the aura of what they call "guardianship functions" in order to wield powerful influence over senior executives, this aura was a ruse and sham. No legitimate guardianship functions or issues were implicated by any conduct of Sullivan. In addition, Brodsky and Kayne grossly, deliberately and maliciously exceeded their respective job authority; including for example:

    a.    Intervening to dictate compensation for Sullivan.

    b.    Intervening to reduce bonus payable to Sullivan.

    c.    Improperly taking control of the review process concerning Sullivan's review.

    d.    Writing deliberately false and scurrilous materials regarding Sullivan, and doing so under circumstances when normally they would have no reason to write review materials at all.

    e.    Demanding that Sullivan's superiors take direction from Brodsky and Kayne regarding the content of Sullivan's 2005 review.

24.    On information and belief, the control exerted by Brodsky-Kayne was so great that Sullivan's direct superior was not even told of the content of Sullivan's review until a matter of a few days prior to the review being presented to Sullivan. The review text, insofar as it was negative, was unexpected by the executives who supervised Sullivan, and those executives would not have agreed with that text absent the

unauthorized, malicious intimidation of Brodsky-Kayne. The review, insofar as it was negative, was carefully crafted by Brodsky-Kayne.

25.    Prior to learning of the negative review only a few days prior to the review itself, Sullivan's supervisor had received no notice or indication whatsoever that there were any questions, doubts, or negative remarks regarding Sullivan's performance. The tenor and text of the review as designed by Brodsky and Kayne came as a shock not only to Sullivan, but to the supervising executive who according to proper procedures would have been in charge of that review from the beginning.

26.    Normal procedure at Morgan Stanley requires that when an employee is facing issues which would result in a negative review, that employee should be given notice of the issues and appropriate counseling, assistance and support to address them. Prior to the fabricated review complained of herein, Sullivan never received any notice from anyone of any issue with his performance. He never received any counseling, assistance or other support regarding his performance. He was never told that he had a potentially career-ending issue until he read about it in the review designed by Brodsky and Kayne.

27.    This conduct is unprecedented at Morgan Stanley, where the review process is always touted as a fair, reliable, trustworthy way to improve upon a "Culture of Excellence" to which the Firm always says it is striving.

28.    On information and belief, Sullivan's supervisor attempted to defend Sullivan and to prevent or reduce the unjustified statements contained in Sullivan's review as designed by Brodsky and Kayne.

29.    On information and belief, even before his review was completed, Brodsky attempted to have Sullivan fired, but the acting President of the retail division refused, and told Brodsky and Kayne with reference to Sullivan that "he's one of my best guys," or words to that effect.  Because the acting President would soon be replaced by a new, permanent President, these efforts delayed, but were insufficient to stop the train on which Brodsky and Kayne were railroading Sullivan out of the firm.

30.    On information and belief, despite the efforts of Sullivan's direct and indirect supervisors, Brodsky and Kayne endeavored to and in fact did keep out many legitimate good parts of Sullivan's review.

31.    On December 16, 2005, Sullivan was for the first time shown his review.

32.    The December 16, 2005 review was filled with false statements regarding Sullivan's performance, including by way of example the following (collectively, but also including others apparent on the face of the review and made in connection with the review and evaluation process, the "Defamatory Statements"):

   a.    That the Evaluator Director was Michael Burke.

   b.    That the evaluation had been in fact approved by Sullivan's Evaluation Director.

   c.    That "Ed had a very challenging 2005".

   d.    That Sullivan "has been slow to embrace the strong guardianship principles that have been stressed this year."

   e.    That Sullivan "has not recognized the changing control environment and has had some judgment issues that have raised concern."

f.   That Sullivan's accomplishments "have been offset by his decisions relating to risk management and guardianship."

g.   That "The feedback from National Sales and guardianship functions suggests that Ed still doesn't appreciate these risks."

h.   That "Ed has had significant judgment issues this year."

i.   That Sullivan "is too often pro-FA [financial advisor] and pushes the FA's interests at the risk of the Firm's."

j.   That "one evaluator wrote"[1] that "At times, I question Ed's judgment. His loyalty to his FAs and managers sometimes clouds his judgment."

k.   That Sullivan "has specifically had a number of judgment issues around hiring of managers and the discipline of senior producers."

l.   That "In these distances [sic], he [Sullivan] gives the appearance of not appreciating or understanding the risks of not taking the necessary action."

m.   That "one evaluator wrote" that "[Sullivan] does not always deal with compliance matters in a timely manner."

n.   That Sullivan "did not embrace the Regional Risk Forum rollout the way he should have." And that he "didn't look to drive and own the agenda" for the Regional Risk Forum.

o.   That "one evaluator commented" that "at times, I think Ed needs to have a greater recognition of the changing business environment."

---

[1]   Allegations which state that "one evaluator wrote" or the like are disputed not only as to content but as to whether in fact such statements were written by a <u>bona fide</u> evaluator rather than Brodsky, Kayne or one of their cohort.

    p.   That Sullivan "would benefit from increased effort to establish
stronger relationships with key support areas of the business: legal,
compliance, and HR."

    q.   That Sullivan "needs to partner more with the groups who can help
him achieve the Guardianship results we are looking for."

    r.   That Sullivan has "developmental issues with respect to guardianship
and risk management."

33.    The Defamatory Statements also include material omissions of positive statements from the review which, on information and belief, were excised, expunged and excluded from the Review by Brodsky and Kayne and their cohort despite the desire, expectation and request of Sullivan's supervisors that such positive statements be included in Sullivan's review.

34.    On information and belief, every issue identified in Sullivan's review was the result of individual discussions with Brodsky or Kayne or someone acting under their instructions to carry out their scheme.

35.    After the December 2005 review, Sullivan met with Eric Kayne about the assertions in the review, and in particular he requested specific instances of what is described in the review as Sullivan's purportedly poor decisionmaking (after 25 years of kudos for that same decisionmaking). Confronted by Sullivan with clear and rational explanations for the specious charges in the review, neither Brodsky nor his subordinate, Eric Kayne, were able to produce any valid concrete example of actual poor decisionmaking by Sullivan. Kayne was only able to identify two examples at all, and in neither case were the examples proof of poor decisionmaking – to the contrary, both were

instances of the review having painted an incomplete and inaccurate picture. In the absence of concrete examples to support the statements in the review, Brodsky and Kayne could do no better than to refer vaguely to "perceptions."

36.    On May 13, 2006, ten days before plaintiff's fifty-sixth birthday, plaintiff's employment terminated.

37.    This termination was caused by the actions of Brodsky and Kayne and the age-based discrimination of the Defendants.

38.    The reason given for the termination was the illegitimate evaluation created by Brodsky and Kayne.

39.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

40.    The actions of the defendants were wanton, reckless and taken with callous disregard of plaintiff's rights. Under New York law, punitive damages are available when a defendant's tortious conduct is wanton, willful or constitutes morally culpable conduct to an extreme degree. Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 371 (2d Cir.1988); Childress v. Taylor, 798 F.Supp. 981, 997 (S.D.N.Y.1992); Borkowski v. Borkowski, 39 N.Y.2d 982, 983, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287, 287 (1976).

41.    Punitive damages are available under New York law where – as here -- a wrong is aggravated by recklessness or willfulness, whether or not directed against the public generally. Roy Export Co. v. Columbia Broadcasting System, 672 F.2d 1095, 1106 (2d Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 509 (2d Cir.1991).

42.    Punitive damages are available under New York law for conduct constituting – for example -- tortious interference or defamation. Kelly v. L.L. Cool J., 145 F.R.D. 32, 38 (S.D.N.Y.1992), aff'd, 23 F.3d 398 (2d Cir.), cert. denied, 513 U.S. 950, 115 S.Ct. 365, 130 L.Ed.2d 318 (1994) (tortious interference with business relations); Kovacs v. Briarcliffe School, 208 A.D.2d 686, 688, 617 N.Y.S.2d 804, 806 (2d Dep't 1994) (defamation).

### COUNT I

**Against Brodsky and Kayne**

**(DEFAMATION: Slander, Libel, Injurious Falsehood)**

43.    Plaintiff repeats the allegations contained in paragraphs 1 through 42.

44.    The Defamatory Statements were each statements of fact; or, in the alternative, were statements of mixed fact and opinion and would be understood by persons reading the Review to contain statements of fact.

45.    The Defamatory Statements were made in writing and published in writing.

46.    In addition, the Defamatory Statements were, on information and belief, made orally.

47.    The statements of fact contained in the Defamatory Statements were false, not only individually, but also when taken in context, and when taken as a whole.

48.    The Defamatory Statements were each of and concerning Sullivan.

49.    The Defamatory Statements were each made to one or more third parties.

50.    The Defamatory Statements were made with malice.

51.    The Defamatory Statements were made solely for spite or ill will.

- 13 -

52.    Brodsky and Kayne made the Defamatory Statements.

53.    Brodsky and Kayne made the Defamatory Statements with malice.

54.    Brodsky and Kayne made the Defamatory Statements with knowledge of their falsity.

55.    Brodsky and Kayne made the Defamatory Statements with reckless disregard for whether the statements were false.

56.    As a direct and proximate result of Brodsky and Kayne's making the Defamatory Statements, Sullivan lost compensation, bonus money, prestige, future earnings, and ultimately, his 25 year career.

57.    The Defamatory Statements constitute Slander per se, Libel per se, and Injurious Falsehood per se.

58.    The Defamatory Statements were made outside the scope of authority granted to Brodsky and Kayne.

59.    The Defamatory Statements were wholly inconsistent with the purpose, guidelines, and spirit of the Morgan Stanley evaluation process.

60.    Under the circumstances, the Defamatory Statements are not protected by any privilege, and Brodsky and Kayne are likewise not protected by any privilege.

61.    As a direct and proximate result of the foregoing, Sullivan was damaged in an amount to be determined at trial but including lost salary, lost benefits, lost bonus, lost prestige, lost future earnings, lost promotional opportunities, and other harm, in an amount not less than $10,000,000.00.

## COUNT II

**Against Brodsky and Kayne**

**(TORTIOUS INTERFERENCE)**

62.    Plaintiff repeats the allegations of paragraphs 1 through 61.

63.    The Defamatory Statements constituted multiple instances of independent torts which contributed to the efforts of Brodsky and Kayne to interfere with Sullivan's reasonable prospective commercial advantage in the form of his continued employment and compensation.

64.    The Defamatory Statements constituted multiple instances of independent torts which contributed to the efforts of Brodsky and Kayne to interfere with Sullivan's accrued contractual rights regarding his bonus for 2005.

65.    The actions of Brodsky and Kayne, including their interference with salary and bonus decisions for Sullivan, were outside the authority of both Brodsky and Kayne.

66.    As a direct and proximate result of the foregoing, Sullivan was damaged in an amount to be determined at trial but including lost salary, lost benefits, lost bonus, lost prestige, lost promotional opportunities,  and other harm, in an amount not less than $10,000,000.00.

## COUNT III

**Against all Defendants**

**(AGE DISCRIMINATION)**

67.    Plaintiff repeats allegations 1 through 66.

68.    Plaintiff was a member of the age group protected by the Age discrimination in Employment Act of 1967 ("ADEA").

69.    Defendant Morgan Stanley is engaged in an industry affecting commerce as defined in the ADEA.

70.    Defendant Morgan Stanley employs more than twenty (20) employees and has done so continuously for years.

71.    Defendants Brodsky and Kayne, although acting in excess of their authority in the actions specifically alleged in connection with Counts I and II, also and separately acted as the agent of Morgan Stanley in connection with the age-based discrimination alleged.

72.    Plaintiff was qualified for his position.

73.    Plaintiff was the subject of an adverse employment action; specifically, he was discharged.

74.    Plaintiff was the subject of a series of related, continuous adverse employment actions, including loss of accrued bonus, as more fully alleged in this complaint.

75.    The circumstances of the adverse employment actions give rise to an inference of discrimination on the basis of age.

76.    Younger employees received more favorable treatment than did Sullivan.

77.    Defendant Brodsky overtly proposed terminating Plaintiff to make room for a younger employee.

78.    Without limitation to these examples, some of the circumstances giving rise to an inference of discrimination on the basis of age include:

   a.   Plaintiff was 56 when he was terminated.

b.  Plaintiff was not only qualified, but was an exemplary employee with numerous commendations and the support of his superiors.

c.  Plaintiff was the victim of a smear campaign.

d.  The smear campaign was undertaken by two executive of the Human Resources Department of Morgan Stanley, who are normally charged with avoiding claims against Morgan Stanley for age-based discrimination, among other things.

e.  It is reasonable to infer that these Human Resources executives exceeded their proper authority and launched the smear campaign for the improper purpose of creating a false record to conceal the age-based reason for the adverse employment actions alleged.

79.     On October 10, 2006, plaintiff filed with the EEOC a charge of discrimination based upon the ADEA (the "Charge").  That Charge was automatically and simultaneously referred to the state agency with jurisdiction pursuant to the agency work-sharing agreement.

80.     This complaint is filed at least sixty (60) days after the filing of the Charge.

81.     As a direct and proximate result of the foregoing, plaintiff has been damaged in an amount to be determined at trial but including lost salary, lost benefits, lost bonus, lost prestige, lost promotional opportunities,  and other harm, in an amount not less than $10,000,000.00.

WHEREFORE plaintiff Edward Sullivan demands judgment against defendants Brodsky and Kayne on all counts, and against Morgan Stanley on Count III, jointly and severally on the counts in common among defendants, as follows:

A.    On Count III, an order that Morgan Stanley hire plaintiff or restore plaintiff to his former position with full seniority, status, salary increments, bonuses and benefits, to the same extent that he would have received but for defendants unlawful conduct;

B.    On Count III, an order prohibiting Morgan Stanley from continuing or maintaining the policy, practice and/or custom of denying job benefits to employees on the basis of age;

C.    An order prohibiting executives in Morgan Stanley's Human Resources department from acting contrary to Morgan Stanley's "360 degree" evaluation process;

D.    An award to plaintiff of his actual damages in an amount not less than $10,000,000.00, to be determined at trial, for loss of wages, benefits, and promotional opportunities, including an award of front pay compensating plaintiff for loss of future salary and benefits;

E.    On Count III, an award to plaintiff of double his actual damages in an amount not less than $20,000,000.00, to be determined at trial, as liquidated damages under 29 U.S.C.A. § 626(b);

F.    An award to plaintiff of the costs of this action, together with his reasonable attorneys' fees as allowed by law; and

G.    Such other and further relief as this Court finds just and proper.

## JURY DEMAND

Plaintiff demands trial by jury of all issues so triable.


Dated:  New York, New York
        January 2, 2007

                                    ZUKERMAN, GORE & BRANDEIS, LLP



                                    By:_____/s/_____
                                          John K. Crossman (JKC 7387)
                                    Jeffrey D. Zukerman (JDZ 3796)
                                    Frank C. Welzer (FCW 7159)
                                    875 Third Avenue
                                    Twenty-Eighth Floor
                                    New York, New York 10022
                                    212.223.6700

                                    *Attorneys for plaintiff, Edward M. Sullivan*