# EXHIBIT
# A

EDWARD M. SULLIVAN

v.

JEFFREY BRODSKY, ERIC KAYNE and
MORGAN STANLEY

**Expert Report of**

**CAREN B. GOLDBERG, PH.D.**

**DECEMBER 19, 2007**

# EXPERT REPORT OF CAREN B. GOLDBERG, PH.D.

## SUMMARY OF QUALIFICATIONS AND EXPERIENCE

1.     I have been a faculty member in the Management Department at the Kogod School of Business at American University for two years.  Prior to joining American University, I was on the faculty at George Washington University for nine years, two of which I served as the Program Director for Human Resources.  For over a decade, I have taught undergraduate, masters and doctoral level courses in Human Resource Management, Organizational Behavior, and Research Design.  Discrimination is a topic which I have covered in my undergraduate and masters level Introduction to Human Resource courses, my undergraduate Cases and Exercises in Human Resource Management courses, my masters level Human Resources/Organizational Behavior survey courses, my masters level Performance Management and Development courses, and my Ph.D. Seminar in Human Resource Management.  In addition, I have covered the topic of discrimination in several off-campus Accelerated MBA and Executive MBA courses that I've taught, as well as in training modules that I have designed and delivered for the Center for Excellence in Public Leadership and the Council of Governments.

2.     I have written more than 50 articles for peer-reviewed journals and conferences, over 20 of which have focused partly or completely on decisions about older workers.  I have also authored three invited book chapters, two of which addressed age discrimination.  My doctoral dissertation explored the impact of age stereotypes on applicant assessments.  My research has been published in *Journal of Applied Psychology, Human Resource Management, Group and Organization Management, Journal of Organizational Behavior, Psychology of Women Quarterly, Academy of Management Best Paper Proceedings, Sex Roles, Assessment, Journal of Business Research, Representative Research in Social Psychology, Journal of Career Planning and Development, Business Journal of Hispanic Research,* and *Journal of Managerial Psychology.*  I have also conducted several media interviews, including a *Dateline, NBC*

story on age discrimination.

3.      I have engaged in a variety of important leadership roles in my profession, including a three-year term as an Associate Editor of *Group and Organization Management*, an editorial board member of *Group and Organization Management*, *Human Resource Management*, and *Journal of Management*, and Track Chair for the Human Resource Division of the Southern Management Association.  As such, I am very familiar with the peer-review process.  In directing the peer-review process for the academic journal that I edited and for the conference track that I chaired, I made the ultimate decisions as to which manuscripts would be accepted and which manuscripts would not and provided authors with constructive feedback to improve their research.  I have also contributed to the peer-review process for the academic journals at which I am an editorial board member, by providing constructive criticism to authors who submitted their work to those journals.  The peer-review process ensures that manuscripts submitted receive thorough scrutiny from highly qualified reviewers who are experts in their field.

4.      I received my B.A. degree in Psychology from the State University of New York at Stony Brook in 1987, my M.B.A. degree from the State University of New York at Binghamton in 1990, and my Ph.D. degree in Management from Georgia State University in 1997.

5.      From 1988 to 1989, I worked in the compensation department at United Health Services.

6.      Attached to this report is a current copy of my *curriculum vita*, which contains a more detailed description of my professional background, including a list of my publications (see Exhibit A).

## SUMMARY OF EXPERT OPINION

7.      Mr. Gorman terminated Edward Sullivan because of his age.  Both Mr. Sullivan and Ms. Stillwell were placed in the same box in the talent grid (PX 25), yet Mr.

Sullivan, who was 55, was terminated, while Ms. Stillwell, who was eleven years his junior, was given executive coaching. This disparity occurred, despite the fact that Mr. Sullivan's 360 Degree Evaluation (PX 4, Bates p. 00493)) was objectively more favorable than Ms. Stillwell's (PX 42, Bates p. 001916) was. That the defense was unable to provide any non-age-based reason as to why Mr. Sullivan never received coaching, while his younger colleague did, provides concrete evidence of age discrimination. That this inequity occurred in an environment where public statements by a regional director and the president such as "let's let the old guy get up to the front of the line" and "ensure that young people are given an opportunity" were deemed acceptable, and where e-mails between top level executives tout a regional director candidate's relative youth with the same weight as his performance as an area manager, provides further evidence of age bias, to even an untrained observer. However, as an expert on age stereotypes, it is obvious that these concrete illustrations represent but a handful of countless examples of how age discrimination affected the decision-making process at Morgan Stanley, ultimately including the decision to terminate Mr. Sullivan.

Mr. Gorman openly admitted to forming "rapid-fire points of view," making "subjective judgments," and using his "instinct" in deciding to terminate Mr. Sullivan. By definition, an age stereotype is a subjective judgment that one makes in a rapid-fire manner about an individual, based on his/her age. The link between ageist stereotypes and age discrimination is well documented in studies that have been published in some of the most highly respected journals in the field of Human Resource Management/Industrial Psychology. The research on older worker stereotypes indicates that people view older workers as being less flexible, less adaptable, less trainable, less

interested in technological change, less energetic, and more difficult to get along with than their younger counterparts. Throughout the deposition transcripts, comments relating to these ageist stereotypes came up repeatedly with numerous references made to a "continuous learning environment," "driving change," "embracing change," "adapting," and being "energetic." Mr. Gorman admitted to having relied on rapid fire points of view, subjective judgments, and instinct in assessing Mr. Sullivan's ability to change, adapt and be energetic. As these points of view, judgments, and instincts are synonymous with stereotypes, Mr. Gorman has, effectively confessed to terminating Mr. Sullivan based on ageist stereotypes.

Beyond Mr. Gorman's admission, the situational factors surrounding Mr. Sullivan's termination provide an overwhelming amount of circumstantial evidence pointing to age discrimination at Morgan Stanley. The literature on age stereotypes indicates a variety of factors that make ageist stereotypes more prevalent and more likely to result in negative actions toward older workers (Pendry & Macrae, 1999; Perry & Finkelstein, 1999; Ravenson, 1989; Shore, Cleveland, & Goldberg, 2003). This research indicates that age stereotypes translate into age discrimination when the organizational culture supports ageism, when decision-makers are cognitively busy, when limited information is available about the target individual, when older target individuals are being directly compared to younger individuals, when the target individual's age violates an age norm, when the requirements of the job are associated with youth-based stereotypes, and when the decision-maker values attributes associated with youth. There was a confluence of all of these factors at Morgan Stanley, resulting in the "perfect storm" for age discrimination: 1.) The culture at Morgan Stanley was accepting of public

derogatory remarks about older workers; 2.) Morgan Stanley was in what Mr. Gorman

referred to as "crisis situation" when he took the helm; 3.) Mr. Gorman, who

acknowledged having erred in his initial judgment of Mr. Brodsky, made his decision to

terminate Mr. Sullivan after having spent only 60-70 minutes meeting him; 4.) During the

two face-to-face meetings Mr. Gorman had with Mr. Sullivan, Mr. Sullivan was being

directly compared to younger employees with whom he was ultimately competing to

retain his employment at Morgan Stanley; 5.) Mr. Gorman was considerably younger

than Mr. Sullivan, which violates the norm of a supervisor being older than his/her

subordinate; 6.) The perceived requirements of the job articulated by Mr. Gorman

(energy, adaptability, ability to drive change) were consistent with youth-based

stereotypes; and 7.) Mr. Gorman repeatedly indicated that he values these same attributes

(energy, adaptability, ability to drive change) that are associated with youth. The

prevalence of each of these seven factors at Morgan Stanley, the ageist stereotypes that

the defendants openly expressed, and Mr. Gorman's acknowledgement of having relied

on age stereotypes in deciding to terminate Mr. Sullivan make clear that Mr. Sullivan was

terminated because of his age.

## MATERIALS CONSIDERED

8.    The documents that I considered in forming my opinions are the deposition

transcripts of Edward Sullivan, James Gorman, Richard Sanchez, Jeffrey Brodsky, Eric

Kayne, and Mihal Nihari, most of the plaintiff's exhibits referenced in these transcripts,

and several scholarly articles, which I reference in the text of the report and list at the end

of this report. I anticipate further work between now and the trial, during which time, I

expect to review other information, as provided.

**COMPENSATION**

9.     For my work on this case, I am being paid $250 per hour plus expenses.  I have no

financial interest in the outcome of the case.

**THE STEREOTYPING PROCESS**

10.     The term "stereotypes" was introduced into the social sciences by Lippman

(1922), who characterized them as, "pictures in our heads" that are utilized to make sense

of situations that are "too busy, too complex, or too fleeting."  This definition is

particularly noteworthy in the current case, as Mr. Gorman's disclosure (p. 152) that there

were, "bits of information that were circling around in my head," is nearly a verbatim

quote from Lippman's pioneering work on stereotypes.  In lay terms, stereotyping refers

to making judgments or attributions about an individual, based on his/her membership in

a particular category.  These judgments are general impressions, based on little or no

information about a specific target individual; rather, they are initial impressions, based

on information about the category to which the individual belongs.  Stereotyping is a

cognitive process whereby characteristics about target individuals are stored and retrieved

in the perceiver's memory.  Because they are easily observed, physical features such as

age are a common basis for storing and retrieving information from memory.  As people

are bombarded with more stimuli than they could possibly attend to, they use stereotypes

as a cognitive shortcut.  Stereotypes are typically based in kernels of truth.  Thus, a given

stereotype about a group often emerges because that group differs, on average, from

another group.  For example, the stereotype that men are more assertive than women

arises out of actual average differences in men's versus women's assertiveness.

Stereotypes, in themselves, are not problematic; indeed, they serve an important function of cognitively simplifying the world. However, stereotypes become problematic, when people make decisions about individuals based on their membership in a negatively stereotyped group. This obviously occurred at Morgan Stanley, where over the course of just seven pages of testimony (pp. 148-155), Mr. Gorman makes twelve references to relying on stereotypes in making the decision to terminate Mr. Sullivan: "rapid points of view;" "instinct;" "gut instinct;" "judgment;" "subjective judgment;" "a judgment call;" "my own judgment;" "bits of information that were circling around in my head;" "what I felt;" "subjective judgments;" "a point of view;" "my judgment;" and "I can't recollect a specific fact." To put his reliance on ageist stereotypes in context, in this same short section of his testimony, Mr. Gorman indicates that "my judgment as to what was required was... a *willingness to change* dramatically," "a judgment call as to who could... *get the job done*," "one makes subjective judgments based upon how well you think somebody *can adapt*," "my... judgment was that *he would not adapt* as well. And I... wasn't looking for people to *adapt* as well. I was looking for people to *adapt* at an extraordinary level... Ed was not even close to that level, in my opinion." In short, not only did Mr. Gorman unequivocally acknowledge relying on stereotypes to make the decision to terminate Mr. Sullivan, he went so far as to indicate the particular ageist stereotypes upon which he relied to do so. These are highlighted in italics above and discussed further in the section below, along with additional ageist stereotypes that were mentioned elsewhere in the deposition transcripts.

### CONTENT OF AGEIST STEREOTYPES

11.     Researchers have documented a number of stereotypic beliefs that people have regarding older workers. Below, I provide the definitions and content of these stereotypes and the research supporting the prevalence of those which are germane to Mr. Sullivan's case. In addition, I point to instances in the depositions where reference was made to Mr. Sullivan embodying these stereotypes. I conclude each section with examples attesting to the fact that Mr. Sullivan's behavior was quite contrary to these stereotypes.

     a. Ageist Stereotype of Untrainability. The stereotype that older individuals are less trainable is so engrained that we have the adage, "you can't teach an old dog new tricks" to refer to this perception. Stereotypes of untrainability center on a perceptions of decreased intelligence and decreased desire and ability to learn new things, to catch onto new ideas, and to be trained. An abundance of research indicates that older workers are, indeed, perceived as being less trainable than their younger counterparts. For example, Rosen and Jerdee (1976a) found significant differences in perceptions of potential for development of a young employee and potential for development of an old employee. Other researchers (Crew, 1983; Singer, 1987) have reported similar findings with regard to perceptions of younger versus older targets. Several examples at Morgan Stanley indicate that Mr. Sullivan was stereotyped as being untrainable:

- The fact that despite being recommended for coaching, the 55 year-old Mr. Sullivan was not provided coaching, whereas the 45 year-old Ms. Stillwell was provided coaching. This example is particularly noteworthy as it directly replicates the findings of Rosen & Jerdee (1976b), who found that people are significantly more likely to recommend training and significantly less likely to recommend termination for younger target employees compared to older target employees.
- The fact that the coaching for which Mr. Sullivan was being recommended was to be delivered by an external Ph.D. level psychologist. In contrast, despite the fact that

Ms. Stillwell's evaluation was more negative than Mr. Sullivan's was, the HR department at Morgan Stanley believed that Mr. Kayne could deliver everything needed to Ms. Stillwell.

- In exhibit 65, Gorman noted that Morgan Stanley needs to "be in a continuous learning environment, because the world around us is changing." In the same speech, he goes on to say that he will "encourage and work with the management to ensure we give young people the opportunity coming into this business."

Despite these examples, nothing in the deposition transcripts indicated that Mr. Sullivan lacked the interest or ability to be trained. On the contrary, Mr. Kayne disclosed (p. 334) that Mr. Sullivan had a "development issue where we feel like he can rehabilitate with some coaching." Likewise, Mr. Brodsky (p. 229) testified he believed that Mr. Sullivan, "could turn it around." Further, Mr. Sullivan, himself, stated (pp. 169 – 171) that he was quite interested in training: "I was always trying to improve my technology skills," "I was looking to improve on my strengths," "I was always looking to improve, improve in general, improve in those areas." Moreover, "job knowledge" was indicated as a "standout strength" by his evaluation director, Mr. Burke, and his knowledge and desire to learn were noted in nine separate comments on his 360 degree review (PX 4, Bates pp. 00495-00504). Sample comments include, "he draws from that experience to provide very insightful perspective on a variety of issues," "he as a deep knowledge of the firm's product offerings, as well as the unique strategy challenges facing us in the current business environment. He is also intimately familiar with the challenging legal and regulatory landscape. Ed uses all of this knowledge to maximum advantage on behalf of the firm," and "Ed uniquely understands and appreciates the importance of guardianship as a core value of the firm. As Regional Director, he has committed substantial time to legal and compliance training," and "he is a wealth of knowledge and

has a high level of understanding for the business both past and present… Understands all issues."

b. Ageist Stereotype of Resistance to Change/Lack of Adaptability.  The adaptability stereotype comprises such characteristics as the inability to provide innovative and fresh solutions or new ideas, rigidity, set in one's ways, and the inability to adapt to changing work situations.  Several researchers provide evidence that older workers are perceived more negatively than younger workers on these characteristics (Perry & Varney, 1978; Ringenbach & Jacobs, 1994; Rosen & Jerdee, 1976a; Singer, 1987).  The deposition transcripts point to several instances where the ageist stereotype of resistance to change factored into assessments that were made about Mr. Sullivan:

- Mr. Gorman disclosed in his deposition (pp. 140 – 144) that his initial impression of Ed was that he "would have difficulty adapting to and embracing the kind of change that I needed… and I felt that what I needed was executives who could embrace change… what I was looking for was executives who were willing and able to embrace that change, make the tough decisions and get with the program very, very quickly… My *instinct* at the time was that Ed would not do that… I wondered through the course of those visits and the conversations we … had whether he had that ability… to drive change in a very aggressive, focused way… I was looking… to find a very small number of executives who could work in a very focused and disciplined way to make the changes that needed to be made immediately.  And my view coming out of the Boston trip was that Ed had not impressed me that he was that kind of executive.  In the interview that I had with him, that view became firmer and firmer and it was calibrated by discussions that I had with the individuals about where he ranked in performance and so on. "  Italics were added here to emphasize that these ageist references were made in the clear context of relying on stereotypes.
- Mr. Gorman also noted (pp. 150-155) that the required skill set included "a willingness to change dramatically… One makes *subjective judgments* based on how well you think somebody can adapt to the circumstances… judgment was that he would not adapt as well.  I wasn't looking for people to adapt as well.  I was looking for people to adapt at an extraordinary level and drive this organization… Ed was not even close to that level… *that was my judgment… I can't recollect a specific fact or answer.*  Italics were added here to emphasize that these ageist references were made in the clear context of relying on stereotypes.
- Ms. Nahari notes (p. 220) that her "*general perception* of Ed was that this change that the firm was going through was something that was difficult for him to change with… I had concerns about whether or not he could and would adapt to the way the firm

now was expecting its employees to operate." Italics were added here to emphasize that these ageist references were made in the clear context of relying on stereotypes.
- On page 221, Ms. Nahari continues, "there was a consensus that Ed was somebody that would not, could not adapt to these changes."

In these examples, Mr. Gorman and Ms. Nahari revealed that they relied on ageist stereotypes regarding resistance to change/lack of adaptability in making decisions about Mr. Sullivan. However the evidence makes clear that Ed is not resistant to change or unable to adapt. Indeed, several comments on his 360 Degree Feedback report indicate that Ed was quite capable of adapting to even the most difficult situations. His evaluation director, Mr. Burke, summarized in Mr. Sullivan's 360 Degree Feedback report that "Ed led his Area and Branch managers in an aggressive retention effort in the face of unrelenting negative press," "provide insightful perspective on a variety of issues," "Ed's tenure has allowed the field to see him under varying market and business conditions and his leadership is consistent," and "Ed is noted for being 'enthusiastic about everything he does and innovative in his approach." Examples of some of the many other individual comments in Mr. Sullivan's 360 Review (PX 4, Bates pp. 00495-00504) that make similar reference to his adaptability and innovativeness include, "Ed does a great job providing support and insight into different situations," and, "Consistently gives ideas and suggestions for moving ahead." In addition, as noted in the previous section, Mr. Sullivan indicated on page 169 of his deposition, that he actively sought opportunities to improve his skills and be able to integrate new skills into the business. Moreover, the fact that Mr. Sullivan had received a promotion approximately 2.5 years prior to his termination indicates that he was clearly able to adapt to different job responsibilities.

c. Ageist Stereotype of Decreased Physical Performance Capacity. The age-related stereotype of decreased physical performance capacity includes perceptions that older

workers have less strength, decreased stamina, lower energy levels, lower activity levels,

less productivity, and a slower pace of work than their younger counterparts.  The

empirical research in this area supports the idea that age is a significant predictor of these

perceptions of decreased physical performance capacity (Crew, 1983; Ringenbach &

Jacobs, 1994; Rosen & Jerdee, 1976a, Singer, 1987).  It is clear from the numerous

references that Mr. Gorman made to energy, that he made judgments about Mr.

Sullivan's energy, based on his age and relied on these judgments in making his decision

to terminate Mr. Sullivan:

- In his broadcast (PX 70; deposition p. 214 - 216), Mr. Gorman states that "it is clear... as we move forward as an organization, that we need to re-energize our management group." He indicates that he didn't recall whether he felt that Ed was one of the people that had insufficient energy on that date (3/16/06).  But on p. 216, he goes on to say that "the reason I fired Ed Sullivan was because I felt he couldn't operate at the level that I wanted him to operate at. Which was not *just* energy. It's a combination of ...your ability to do something about those issues, *which is a function of, yes energy.*  Italics added to underscore Mr. Gorman's admission that he relied on this ageist stereotype to make the decision to terminate Mr. Sullivan, based on the ageist stereotype that older people lack energy.
- A while later (pp. 220-221), Mr. Gorman notes that he "regarded it as very important to get in and energize the people who are responsible for doing that job, which were our financial advisors."
- On pages 239-240 and exhibit 74, where Mr. Gorman notes that he was excited about the energy and excitement after the reorganization, he indicates that he was referring to "energy related to their willingness to work hard and dig in."

   In these examples, Mr. Gorman unequivocally discloses that he terminated Mr.

Sullivan because he did not feel that at 55, Mr. Sullivan was likely to have the level of

energy required to be a regional director.  Contrary to Mr. Gorman's stereotypic

assessment, however, the evidence points to the fact that Mr. Sullivan defied the

stereotype of decreased physical performance capacity.  For example, Mr. Sanchez

indicated in his deposition (p. 170) that in planning the risk forum, "Ed wanted to know

when it was going to end because he wanted to get a workout before cocktail started, which to me, is perfectly reasonable." Further, in Mr. Sullivan's 360 Degree Evaluation, the evaluation director noted in his summary that "Ed led... an aggressive retention effort," "as one evaluator wrote,... 'Ed will always be a stand-up guy,'" and "Ed is noted for being, 'enthusiastic about everything.'" Nine specific comments from other evaluators (PX 4, Bates pp. 00495-00504) revealed that Mr. Sullivan, in fact, exhibits an abundance of energy and enthusiasm. Examples include, "Ed is a results oriented person," "fun to work with. Its people like Ed that make coming to work at MWD fun," and, "will continue to drive successful results... he continues to do everything it takes to drive growth, revenues, profits, and guardianship."

    d. Ageist Stereotypes about Disinterest in Technological Change. Several studies suggest that decision-makers are less likely to devote resources to updating older workers' technological skills than to updating younger workers' technological skills. For example, Rosen and Jerdee (1976b) found that because decision-makers perceived older workers as lacking in desire and ability to keep up with technical change, they were less likely to grant them permission and financial support to attend a conference on technological change, compared to their younger counterparts who made the same request. Further, Cleveland and Landy's (1981) study shows that jobs that have a heavy technology component are stereotyped as young person's jobs. That Morgan Stanley adhered to the stereotype that older workers are disinterested in technological change was observed in Mr. Sanchez's deposition:

- Mr. Sanchez testified (pp. 81-85) that Mr. Sullivan received quite a bit of heat when he terminated a poor performing branch manager, "because this manager had been chosen by a technology group to be a pilot for some new innovative office of the future." Mr. Sanchez further notes that "Ed, as a regional director

was never even informed that this manager was involved in a pilot... something like that should never have been ventured without the regional director involved from the start." Given that Mr. Sullivan was not consulted when he clearly should have been suggests that the technology group perceived Mr. Sullivan as disinterested in technological change and therefore excluded him.

This example suggests that Mr. Sullivan was left out of the loop because he was presumed to be disinterested in technology. However, as noted previously, Mr. Sullivan stated in his deposition (pp. 169), "I was always trying to improve my technology skills."

    e. Ageist Stereotypes about Poor Interpersonal Skills. Ageist stereotypes regarding interpersonal skills include perceptions that older workers are less capable of working effectively with coworkers and clients, less approachable, and less helpful than younger workers. Empirical research has confirmed that subjects perceive older workers as less interpersonally skilled than younger workers (Cleveland & Landy, 1981; Rosen & Jerdee, 1976a; Singer, 1987). Even in a sample in which less than 5% of applicants were above age 40, which makes it very difficult to detect statistically significant results, Goldberg (1997) found that applicant age was significantly related to recruiters' perceptions of applicant interpersonal skills. Throughout the deposition transcripts, the defendants at Morgan Stanley repeatedly suggested that Mr. Sullivan was flip and sarcastic, and forum-shopped until he got the answers he wanted (Brodsky deposition, p. 301, 311; Kayne deposition, pp. 103-111; Nahari deposition, p. 207). However, Mr. Sullivan's supervisor, Mr. Sanchez testified (pp. 71-79) that Mr. Sullivan's actions in these situations were appropriate. It is my opinion that Mr. Sullivan's actions represented a very thorough understanding of effective Human Resource Practices and potential legal and compliance risks.

To provide an example, I refer to the McNamara incident. Both Mr. Brodsky and Mr. Kayne expressed frustration with how Mr. Sullivan handled the McNamara incident. However, the facts reported in the deposition make clear to me that the HR Department did an inadequate job in the investigation and surrounding issues pertinent to this incident. Further, the risk of a sexual harassment lawsuit needs to be weighed against the risk of a wrongful termination suit. Mr. Sullivan did, in fact, unequivocally agree that Mr. McNamara should be terminated. His allowing Mr. McNamara the opportunity to be heard not only reduces the risk of a wrongful termination suit, but demonstrates the type of impartiality as a leader, that resulted in numerous upward evaluators (PX 4, Bates pp. 00495-00499) commenting that Mr. Sullivan "builds commitment and trust" and "earns respect." Therefore, Mr. Sullivan's 24 hour postponement of Mr. McNamara's termination was very appropriate and Mr. Brodsky's and Mr. Kayne's perception that Mr. Sullivan was being difficult in this matter reflects stereotypes.

- While Mr. Brodsky and Mr. Kayne admonished Mr. Sullivan, who was not personally implicated in the incident, for having delayed Mr. McNamara's termination by 24 hours, under their watch, Mr. Brodsky's deposition indicates that Mr. Burke was promoted after having taken a group of subordinates to a strip club. There is quite a lot of evidence in the sexual harassment literature that managers' actions serve to cue subordinates as to what is/isn't acceptable behavior with regards to sexual harassment (Pryor, LaVite, & Stoller, 1993).
- It was appalling to me, that PX 16, a hand-written set of notes, with no date, no indication of who conducted the investigation, and no investigator summary serves as an incident report.
- One of the major issues raised by the defense was that McNamara confessed to having inserted his finger into her vagina, yet there is no mention of a confession anywhere on the report, nor is there any indication that Ms. Rampal did not consent to the behavior.
- Indeed, the report indicates that Mr. McNamara said that the intern said, "kissy, kissy, kissy," which a reasonable person would view as consenting to his behavior. However, there is no evidence that Mr. Strobel asked the other witnesses if she said that. Further, the report indicates that Mr. McNamara was hitting on the intern against her will beforehand, so there should have been some

questioning as to why she went with them to Jonathan's house afterwards, if she did not consent to his advances.

- Given the lack of documentation regarding consent, the fact that Jonathan Conske, who stood to gain from Mr. McNamara's termination, reported the incident, while Ms. Rampal did not, is not inconsequential. Given that Mr. McNamara had a history of similar claims and a reported alcohol problem, it seems very plausible that Mr. Lonske created a situation that would result in Mr. McNamara's termination.

- Given that Mr. McNamara had a history of sexual harassment at other firms, it is shocking that in the environment of guardianship and compliance in which Morgan Stanley operated, the HR Department failed to see the risk of negligent hiring in employing Mr. McNamara.

In short, the McNamara event illustrates that the HR Department at Morgan Stanley acted inappropriately and that Mr. Sullivan's actions with respect to this case indicate a keen awareness of guardianship issues and effective leadership principles. Moreover, despite the age stereotypic characterizations about Mr. Sullivan's interpersonal skills made by Mr. Brodsky, Mr. Kayne, and Ms. Nahari, the 360 Degree Evaluation reveals that Mr. Sullivan received an average communication rating of 8.4. Mr. Burke, the evaluation director commented, "he is also praised for his ability to establish and communicate direction, define expectations and build commitment and trust." Further, Mr. Sullivan was lauded for his communication and interpersonal skills in 26 separate evaluations. Examples include, "Ed does an excellent job of communicating the Region's and the Firm's direction to all of his Area and Branch Managers," "Ed is a very clear communicator. He is able to give direction in a concise manner without resorting to being too pushy. He speaks as a partner and a supporter but can also be a serious supervisor," and "I've worked for a number of RD's and all have treated me well, however, Ed is by far my favorite. His balanced and candid approach as well as his concern for his managers set Ed apart from his peers. I hope I have the pleasure of working for Ed for a long, long time."

To summarize, Mr. Gorman, Mr. Kayne, Mr. Brodsky, and Ms. Nahari have disclosed that they evaluated and made decisions about Mr. Sullivan based on ageist stereotypes. More specifically, Mr. Gorman and Ms. Nahari attested to having based their decision to terminate Mr. Sullivan based on their age stereotypic perceptions of him. Mr. Gorman openly revealed that his *instinct* was that Mr. Sullivan could not embrace change, that *without being able to recollect a specific fact*, his *subjective judgment* was that Mr. Sullivan could not adapt, and that his decision to terminate Mr. Sullivan was a function of his perceived energy level. Likewise, Ms. Nahari openly acknowledged that her *general perception* was that Mr. Sullivan could not adapt. In contrast to these age stereotypic perceptions, however, the evidence provided in Mr. Sullivan's 360 Degree Performance Evaluation and the depositions clearly indicates that Mr. Sullivan does not at all fit with the stereotype of an older employee.

## ENVIRONMENTAL VARIABLES ASSOCIATED WITH INCREASED RELIANCE ON STEREOTYPES

12.    In reaching my conclusion that ageist stereotypes contributed to the unfavorable decisions that Morgan Stanley made about Mr. Sullivan, I considered several contextual and/or environmental factors that have been associated with stereotype reliance. These include a culture of age-based animus, cognitive busyness, limited exposure to the target individual, direct comparisons between Mr. Sullivan and younger individuals, the relative age of Mr. Sullivan vis-à-vis Mr. Gorman, job requirements that are consistent with youth-based stereotypes, and the value that Mr. Gorman placed on characteristics associated with youth. The relevance of each of these factors to Mr. Sullivan's case is discussed below.

a.) Morgan Stanley had a culture of age-based animus.  Discrimination is more apt to

occur in cultures that are tolerant of discrimination.  At Morgan Stanley, ageist

slurs such as, "let's let the old guy get up to the front of the line," "Ed is an old

school type manager," and "ensure that young people are given an opportunity"

were made openly and by people who were high enough in the organizational

hierarchy to shape the culture of Morgan Stanley.  Just as racist jokes and slurs

are indicative of an organization has a racist culture, so too are ageist jokes and

slurs indicative of an organization that has an ageist culture.

More direct evidence of the ageist culture at Morgan Stanley is seen from

the fact that despite being recommended for executive coaching several months

before his termination (PX 9 and 10; Brodsky deposition, p. 265), Mr. Sullivan

never received any coaching.  In contrast, Ms. Stillwell who was in her mid-

forties had received coaching from Mr. Brodsky and from her regional HR

director, Patrick (Brodsky deposition pp. 267-268).  Mr. Kayne also notes in his

testimony (pp. 259-260) that he tries to coach managers, yet he was unable to

provide an explanation as to why Mr. Sullivan was denied coaching, despite Mr.

Kayne's view (p. 365 – 369) that he "was bullish" about Ed's prospects after their

December 16, 2005 meeting.  That developmental needs resulted in termination

for Mr. Sullivan, but coaching for Ms. Stillwell mirror the findings of Rosen and

Jerdee's (1976b) study, in which respondents were significantly less likely to

recommend retraining and significantly more likely to recommend termination for

older employees than for younger employees.

b.) Mr. Gorman was cognitively busy.  Research (Pendry & Macrae, 1999) has consistently supported the notion that cognitive busyness is positively related to reliance on stereotypes.  Coming into what Mr. Gorman acknowledged (p. 150) to be "an organization that was in crisis," an organization that was under fire from the NASD, that was foundering at a 1% profit margin, that had only 7% of its branches meet the organization's own internal compliance standards, familiarizing himself with the organization, and implementing his restructuring plan, Mr. Gorman clearly had an enormous cognitive load.  Under such a situation, one's normal cognitive capacity is reduced.  To exemplify, Mr. Gorman was unable to recall specific comments that were made about whether Mr. Sullivan, in fact, picked him up from the airport in March, 2006.  When an individual is cognitively busy, he/she has fewer cognitive resources to devote to evaluating individuals' competencies; thus, the likelihood of relying on stereotypes increases significantly.

c.) Mr. Gorman admitted that his exposure to Mr. Sullivan was limited.  Because of the many issues with which Mr. Gorman had to contend upon his arrival, his exposure to Mr. Sullivan was quite limited.  Limited information about a target is another well-established contributor to stereotype reliance (Ravenson, 1989).  Prior to the termination meeting, he had met with Mr. Sullivan for about 30 minutes in Florida and for an additional 30-40 minutes on the plane ride to Boston, during much of which Mr. Gorman testified that he was working on other things.  Mr. Gorman notes on page 148 of his deposition that he, "had to evaluate an organization of nearly 15,000 people in the space of 30 days and form some

rapid points of view and then start putting in place management changes as a result of those points of view." This statement is noteworthy, in that it reflects reliance on stereotypes to make termination decisions. The "rapid points of view" to which he refers are, by definition, stereotypes and the "management changes" are the decisions based on those stereotypes. Simply put, this is an admission by Mr. Gorman that he relied on stereotypes to make termination decisions, because he did not have the time to evaluate Mr. Sullivan's actual performance or potential.

d.) Mr. Gorman made direct comparisons between Mr. Sullivan and younger individuals. Research by Cleveland, Festa, & Montgomery (1988) and Finkelstein, Burke, and Raju (1995) indicates that the negative relationship between candidate age and ratings is significantly more negative when direct comparisons are being made between other younger candidates. In discussing his meetings with the Regional Directors in Florida, during which Mr. Gorman was "interviewing people for jobs and... putting in place management changes as a result of those points of view," he stated (Gorman deposition pp. 136-137), that "my own primary view of people was the most determinative factor." He indicated that he arrived at his own primary view of people, "by relying on the meetings I had with them, my interactions and with my instinct." These instinct-based primary views are, by definition, stereotypes. Further, when Mr. Gorman had the meetings in Florida in which he arrived at these instinct-based primary views, the setting was such that he had arranged to have face-to-face meetings with each of the Regional Directors and possibly others, over the course of a

single day. This scenario allows for the type of direct comparisons between younger and older candidates that results in significantly more negative views of older targets. Mr. Gorman's other face-to-face interaction with Mr. Sullivan occurred during a plane ride to Boston, during which 44 year-old Mr. Taylor, who was promoted to Associate Division Director, a position that Mr. Sullivan would have been willing to take, around the time of Mr. Sullivan's termination, was also present. Mr. Sullivan indicated in his testimony (p. 19) that Rick Sanchez confided to him that he believed Mr. Brodsky wanted to put Mr. Taylor in Mr. Sullivan's position.

e.) Mr. Sullivan was older than Mr. Gorman. An abundance of research indicates that people make assessments about one's age appropriateness for a given job based on age norms (Lawrence, 1988; Perry & Finkelstein, 1999). The age of an employee relative to his/her manager serves as an important indicator of adherence to or violation of age norms. For example, there is a very strong societal norm that employees *ought to* be younger than their managers. Shore, Cleveland, and Goldberg (2003) found that older employees were given lower promotability ratings and developmental opportunities when they worked for supervisors who were younger than when they worked for supervisors who were older. Thus, the fact that Mr. Gorman, who was in his late 40s, was a few levels above Mr. Sullivan, who was 55, violates the norm of employees being younger than their supervisors, which in turn, contributes to the salience and activation of age-based stereotypes.

22

f.) The job requirements were consistent with youth-based stereotypes and Mr. Gorman placed value on characteristics associated with youth. I discuss these two factors that are associated with stereotype reliance together, because the value that Mr. Gorman placed on characteristics associated with youth is inextricably intertwined with job requirements that he deemed necessary for performing the role of Regional Director. Just as people hold stereotypes of individuals, so too do they hold stereotypes regarding certain jobs. A good deal of research on older workers has supported the notion that decision-makers evaluate target individuals in terms of the degree of match between the stereotypes about the target and the stereotypes about the job (Perry, 1994; Perry & Finkelstein, 1999). As discussed further in point 12, below, adaptability, change, and energy are among the widely held stereotypes associated with youth. Throughout his deposition, Gorman makes numerous references attesting to the value he places on these characteristics and to the stereotypicality of these characteristics for the job.

i.  Page 153 - "I was looking for people to adapt at an extraordinary level."

ii. Page 140-144 - "What I needed was executives who could embrace change... small number of executives who could work in a very focused and disciplined way to make the changes that needed to be made immediately."

iii. Page 202, he says that the leadership skills he looks for in someone managing 1000+ people is "the ability to drive change and drive excellence."

     iv. Pages 220-221.  "And I regarded it as very important to get in and energize the people who are responsible for doing that job, which were our financial advisors."

     v. PX 65 "Morgan Stanley needs to be in a continuous learning environment, because the world around us is changing"

## MR. SULLIVAN'S PERFORMANCE EVALUATION WAS ALTERED TO CREATE A PAPER TRAIL TO GIVE THE APPEARANCE THAT HIS TERMINATION WAS PERFORMANCE-BASED

13.   In addition to the foregoing evidence based on Mr. Gorman's admission of having terminated Mr. Sullivan based on ageist stereotypes and the convergence of circumstances that resulted stereotype-based decisions, there are several other factors in the case that indicate that Mr. Sullivan's termination was not based on performance.

Mr. Kayne testified to having altered Mr. Sullivan's 360 Degree Evaluation, after the evaluation director, Mr. Burke, had completed it, a confession corroborated by PX 3, in which Mr. Kayne is noted as being the author of the evaluation.  Longnecker and his colleagues (Gioia & Longnecker, 1994; Longnecker & Gioia, 2001; Longnecker, Sims, & Gioia, 1987), who are recognized for their contributions to the research on the politics of performance appraisals, have written extensively on the causes of intentionally negatively distorting performance appraisals.  They found that one of the top reasons for intentionally deflating appraisals is to create a paper trail for a planned firing.  They also found that the practice of intentionally deflating performance appraisals is positively related to the organizational level of the person being evaluated, such that politics plays a greater role for executives than for lower level employees.  Intentional downgrading is

also more common in organizations that are economically unhealthy. Finally, these researchers found that intentional deflating of performance appraisals are most likely to occur when the individuals writing the appraisals do not believe that what they wrote will be scrutinized.

Mr. Sullivan was a high level executive, which, in itself, increased the likelihood that politics would play a role in his performance appraisal. However, Morgan Stanley was not a typical organization; it was an "organization in crisis," that was in very poor economic health. More importantly, given that there would be a new President coming to Morgan Stanley, who would make a multitude of changes in a very short time, made obvious that the deflated appraisal that Mr. Kayne provided would not be scrutinized by Mr. Gorman. It is clear, therefore, that Mr. Kayne deliberately downgraded Mr. Sullivan's appraisal with the intention of creating a paper trail, which would ultimately result in Mr. Sullivan's termination.

## CONCLUSION

14.    Mr. Gorman terminated Mr. Sullivan because of his age. There was a convergence of circumstances that led to the reliance on stereotypes and Mr. Gorman confessed to having based his decision to terminate Mr. Sullivan on "subjective judgments" "bits of information that were circling around in my head," and "gut instinct" regarding the ageist stereotypes of willingness to change, adaptability, and physical performance capacity. Mr. Kayne deliberately altered Mr. Sullivan's 360 Degree Performance Evaluation to create a paper trail that would document Mr. Sullivan's alleged poor performance, knowing that Mr. Gorman would be too busy to scrutinize the fabricated evaluation and too busy to create more than an initial age

25

stereotype-based impression of Mr. Sullivan.  Given that Mr. Gorman met with Mr.

Sullivan for approximately 60-70 minutes, the only information he had about Mr.

Sullivan, aside from the altered 360 Degree Evaluation, was the ageist stereotypes upon

which he admitted to having relied, to determine that Mr. Sullivan needed to be

terminated.


*Caren Goldberg, Ph.D.*

References

Cleveland, J. N., Festa, R. M., & Montgomery, L. (1988).  Applicant pool composition

and job perceptions:  Impact on decisions regarding an older applicant.  *Journal of*

*Vocational Behavior, 32,* 112-125.

Cleveland, J. N., & Landy, F. J. (1981).  The effects of person and job stereotypes on two

personnel decisions.  *Journal of Applied Psychology, 68,* 609-619.

Crew, J. C. (1983).  Age stereotypes as a function of race.  *Academy of Management*

*Journal, 27,* 431-435.

Finkelstein, L. M., Burke, M. J., & Raju, N. S.  (1995).  Age discrimination in simulated

employment contexts:  An integrative analysis.  *Journal of Applied Psychology,*

*80,* 652-663.

Goldberg, C. B.  (1998).  *The impact of age of applicants and of the applicant pool on*

*recruiters' assessments.*  Dissertation Abstracts International Section A:

Humanities and Social Sciences. Vol 58 (11-A), May 1998.

Lawrence, B. S.  (1988).  New wrinkles in the theory of age:  Demograpy, norms, and

performance ratings.  *Academy of Management Journal, 31,* 309-337.

Lippman, W.  (1922).  *Public Opinion.*  New York;  Harcourt, Brace and Company.

Gioia, D. A., & Longnecker, C. O.  (1994).  Delving into the dark side:  The politics of

executive appraisal.  *Organizational Dynamics,* 47-58

Longnecker, C. O., & Gioia, D. A.  (2001).  Confronting the "politics" in performance

appraisal.  *Business Forum, 25,* 17 - 24.

Longnecker, C. O., Sims, H. P., Gioia, D. A.  (1987).  Behind the mask:  The politics of

employee approaisal.  *Academy of Management Executive, 1,* 183-193.

Pendry, L. F., & Macrae, N. (1999). Cognitive load and person memory: The role of perceived group variability. *European Journal of Social Psychology, 29,* 925-942.

Perry, E. L. (1994). A prototype matching approach to understanding the role of applicant gender and age in the evaluation of job applicants. *Journal of Applied Social Psychology, 24,* 1433-1473.

Perry, E. L., & Finkelstein, L. M. (1999). Toward a broader view of age discrimination in employment-related decisions: A joint consideration of organizational factors and cognitive processes. *Human Resource Management Review, 9,* 21-49.

Perry, J. S., & Varney, T. L. (1978). College students' attitudes toward workers' competence and age. *Psychological Reports, 42,* 1319-1322.

Pryor, J. B., LaVite, C. M., & Stoller, L. M. (1993). A social psychological analysis of sexual harassment: The person/situation interaction. *Journal of Vocational Behavior, 42,* 68-83.

Ravenson, T. A. (1989). Compassionate stereotyping of elderly patients by physicians: Revising the social contact hypothesis. *Psychology and Aging, 4,* 230-234.

Ringenbach, K. L., & Jacobs, R. R. (1994). Development of age stereotypes in the workplace scale. Society of Industrial and Organizational Psychologists Conference, Nashville, TN.

Rosen, B., & Jerdee, T. H. (1976a). The influence of age stereotypes on managerial decisions. *Journal of Applied Psychology, 62,* 428-432.

Rosen, B., & Jerdee, T. H. (1976b). The nature of job-related age stereotypes. *Journal of Applied Psychology, 62,* 180-183.

Shore, L. M., Cleveland, J. N., & Goldberg, C. B. (2003). Work attitudes and decisions

as a function of manager age and employee age. *Journal of Applied Psychology,*

*88,* 529–537.

Singer, M. S. (1987). Age stereotypes as a function of profession. *Journal of Social*

*Psychology, 126,* 691-692.

Goldberg, C. B. (2007). Work and organizational issues in the retention of older employees. Symposium at the Society of Industrial/ Organizational Psychologists conference, New York, NY.

Goldberg, C. B., & Zhang, L. (2006). The positive and negative effects of racism and sexism on perceptions of group cohesiveness and performance. Presented at the Southern Management Association Conference, Clearwater, FL.

Goldberg, C. B. (2006). The impact of organizational practices on recruiting a diverse workforce. Coordinator of symposium presented at the Academy of Management Conference, Atlanta, GA.

Goldberg, C., Perry, E. L., & Finkelstein, L. M. (2006). Targeting older applicants in recruitment: An organizational perspective. Presented the Academy of Management Conference, Atlanta, GA.

Goldberg, C. B., & O'Leary, B. (2006). Theoretical bases for diversity and fairness effects: Linking the two together. Presented at the Academy of Management Conference, Atlanta, GA.

Goldberg, C. & Allen, D. (2005). Web-based recruiting: When women and minorities need not apply. Presented at the Academy of Management Conference, Honolulu, HI.

Goldberg, C., Kaplan, D.M., Marchese, M.M., & Mumford, T.V. (2005). Using popular film and television as pedagogical tools in HR/IR. Presented at the Innovative Teaching in HR/IR Conference. Park City, UT

Goldberg, C., Riordan, C., & Zhang, L. (2004). Relational demography and leadership perceptions: Is similar always better? Presented at the Academy of Management Conference, New Orleans, LA.

Zhang, L., & Goldberg, C. (2004). The effects of sensitivity to surface-level and deep-level diversity on work group performance and attitudes. Presented at the Academy of Management Conference, New Orleans, LA.

Konrad, A.M., Goldberg, C., Sullivan, S., & Yang, Y. (2004). Preferences for job attributes associated with work and family: A longitudinal study. Presented at the Academy of Management Conference, New Orleans, LA *(**Nominated for Best Symposium – Careers Division**).

Goldberg, C., Riordan, C., & Schaffer, B. (2003). Missing pieces in social identity theory: Continuity and status as moderators of similarity. Presented at the Academy of Management Conference. Seattle, WA.

Zhang, L., & Goldberg, C. (2003). The effects of sensitivity to surface-level and deep-level diversity on work group performance and cohesion. Presented at the Eastern Academy of Management International Conference, Porto, Portugal.

Konrad, A., & Goldberg, C. (2002). An examination of the impact of gender context on individuals and organizations. Coordinator of symposium presented at the Academy of Management Conference, Denver, CO.

Goldberg, C., & Konrad, A. (2002). The effects of gender context: A meta-analysis. Presented at the Academy of Management Conference. Denver, CO.

Goldberg, C., & Stone, D. (2001). Older workers and disabled workers: A look at two underutilized groups. Coordinator of symposium presented at the Academy of Management Conference, Washington, DC.

Goldberg, C., Finkelstein, L., Perry, E., & Konrad, A. (2001). Age and career progress: Tests of simple and moderated effects. Presented at the Academy of Management Conference, Washington, DC.

Goldberg, C. (2001). Gender, gender context, and same-sex harassment: re-evaluating our theoretical understanding of social-sexual behavior. Presented at the Society of Industrial/ Organizational Psychologists conference, San Diego, CA.

Goldberg, C. (2000). The impact of different gender contexts on responses to sexual harassment. Southern Management Association conference. Orlando, FL.

Goldberg, C., & Cohen, D. (2000). Walking the walk and talking the talk: Gender differences in the impact of interviewing skills on applicant assessments. Eastern Academy of Management Conference. Danvers, MA.

Case, J., Goldberg, C., McHugh, P., & Moreno-Tello, V. (2000). Cross-cultural perceptions of coworker- and supervisor-initiated social-sexual behaviors. Presented at the Society of Industrial/Organizational Psychologists conference, New Orleans, LA.

Cleveland, J. N., Shore, L. M., & Goldberg, C. (2000). Work attitudes and performance as a function of manager age, employee age, and their interaction. Presented at the Society of Industrial/Organizational Psychologists conference, New Orleans, LA.

Goldberg, C. (1999). Multiple perspectives of sexual harassment. Coordinator of symposium presented at the Academy of Management conference, Chicago, IL.

Goldberg, C., & McHugh, P. (1999). The impact of training on perceptions of and reactions to sexual harassment. Presented at the Academy of Management conference, Chicago, IL.

Taylor, M., Goldberg, C., & Shore, L. (1999). Retirement expectations and retirement satisfaction. Presented at the Society for Industrial/Organizational Psychologists conference, Atlanta, GA.

Goldberg, C. & McHugh, P. (1999). Cultural differences in perceptions of sexual harassment. Presented at the George Washington University Scholars Showcase, Washington, DC.

Goldberg, C. & McHugh, P. (1998). Is it sexual harassment? An East-West comparison. Presented at the Management of Human Resources Conference, Honolulu, HI.

Goldberg, C. (1998). Who responds to surveys? An application of Goodman and Blum's procedure to cross-sectional dyadic research. Presented at the Southern Management Association Conference, New Orleans, LA.

Goldberg, C. & Shore, L.M. (1998). The impact of applicant age and the ages of referents on recruiters' decisions. Presented at the Society for Industrial/Organizational Psychologists Conference, Dallas, TX.

Goldberg, C. (1997). Relational demography: A tale of two theories. Presented at the Academy of Management Conference, Boston, MA.

Goldberg, C. (1997). The impact of job qualifications and interviewing skills on selection decisions. Presented at the George Washington University Scholars Showcase, Washington, DC.

Goldberg, C., & Perry, A. (1996). The relative importance of background and interviewing skills in campus interviews. Presented at the Southern Association of Colleges and Employers Conference, Atlanta, GA.

Goldberg Sharak, C., & Shore, L. M. (1995). Age stereotypes and new hire performance ratings. Presented at the Southern Management Association Conference, Orlando, FL.

Goldberg Sharak, C. (1995). The proposed Employment Nondiscrimination Act: Implications for organizations. Presented at the Academy of Management Conference, Vancouver, BC.

Goldberg Sharak, C., & Shore, L. M. (1994). Measuring age context: A comparison of two approaches. Presented at the Academy of Management Conference, Dallas, TX.

Goldberg Sharak, C., & Waldman, D. A. (1994). Modeling the determinants of employee absenteeism. Presented at the Society for Industrial/Organizational Psychology Conference, Nashville, TN.

## GRANTS, SCHOLARSHIPS, AWARDS, AND HONORS

**Kogod Research Grant** - $6,935. A Multi-source, Multi-wave Investigation of New Hire Fit. Kogod School of Business, American University. 2007. Awarded

**Society for Human Resource Management Foundation**. $170,000. Training as a Best Practice for Immigrant –Friendly Organizations. Project proposal submitted September, 2007.

**Carnegie Foundation**. $170,000. Training as a Best Practice for Immigrant –Friendly Organizations. Denied.

**Crain Summer Research Fellowship** - $12,500. Relational demography and leadership perceptions: Is similar always better? School of Business and Public Management, George Washington University. 2005. Awarded

**Who's Who in America** – Named for 2002, 2003, and 2004 publications.

**Academy of Management Award for Outstanding Service** – Award from Human Resources Division for service as Secretary of the Executive Committee. 2001.

**George Washington University Release Time for Research Award** - $2,000. Employee perceptions of and reactions to sexual harassment: A field study (with Patrick McHugh) George Washington University. 1999.

**Award for Outstanding Teaching Performance -** Department of Management, Georgia State University. Fall, 1995 and Winter, 1996.

**Georgia State University Dissertation Proposal Grant** - $1,000. Georgia State University. 1995.

**Exemplar Research Award** - $2,000. College of Business Administration, Georgia State University. 1995.

**William T. Rutherford Award** - $500.  W. T. Beebe Institute of Personnel and Employment Relations, Georgia State University.  1993.

**New York State Regents Scholar** - $500/year.  New York Board of Regents. 1984 - 1987.

<u>TEACHING INTERESTS AND EXPERIENCE</u>

**Primary Teaching Interests**

Human Resource Management and Organizational Behavior

**Undergraduate Teaching Experience**

❖  Principles of Organizational Theory, Behavior, and Management

❖  GWU Paris Program – Introduction to Human Resource Management

❖  Introduction to Human Resource Management

❖  Introduction to Organizational Behavior

❖  Principles of Management

❖  Advanced Topics:  Cases and Exercises in Human Resource Management

**Master's Teaching Experience**

❖  Organizational Behavior and Human Resource Management

❖  Performance Management and Development

❖  Accelerated MBA – Human Dynamics in Organizations

❖  Executive MBA – Human Resource Management

❖  Pre-MBA Group Dynamics 1-Day Workshop

❖  Accelerated MBA (Off-Campus Mini-Residency) – Dancing in the Minefields:  Managing Employee Performance and Compensation

❖  MBA Organizations, Management, and Leadership

❖  MBA Organizations, Management, and Leadership I

❖ MBA Organizations, Management, and Leadership II

❖ Accelerated MBA (Off-Campus Residency) Organizations, Management, and Leadership II

**Doctoral Teaching Experience**

❖ Doctoral Seminar – Research Design

❖ Doctoral Seminar – Current Research in Human Resource Management

**Independent Study Advising (Master's and Undergraduate)**

     Michelle Lowe Solis (2006)
     Laurie Weinert (2004)
     Kristy Nakai (2003)
     Suzanne Burger (2003)
     Lu Zhang (2003)
     Mariya Goryanima (2001)
     David Metnick (2000)
     Jaclyn Shapiro (1998)
     Susie Weisenfeld (1997)
     Alejandro Chiongbian (1997)
     Julie Yang (1997)

**Doctoral Dissertation Committee Service**

     Elaine Brenner (Psychology- George Washington University), 2006.  Telework and Retention.

     Beverly Nyberg (Human Resource Development – George Washington University), 2004. A Study of Jaques' Requisite Organization Theory as it Relates to the Impact of Person to Role and Person to Supervisor Degree of Fit on Employee Satisfaction in a Non-Profit Service Agency.

     Haven Battles (Psychology – George Washington University), 2000. Professional Self-efficacy and Burnout in Pediatric HIV Nurses.

     M. Martha Neal (Logistics and Operations Management – George Washington University), 1999.  Leadership in a Change Environment: A Case Study in the United States Navy Logistics.

**Student Evaluations**

❖ On two occasions, I received a perfect 5.0 for overall teaching effectiveness.

❖ Throughout my nine years at GWU, averages for all of my overall and item scores for every semester except one, ranged from 4.0 to 5.0 on a five-point scale.

❖ I have also had students in my workshops evaluate my performance.  The scores have consistently been in the 4.5 range.

❖ I received two departmental awards for my teaching performance.


PROFESSIONAL SERVICE ACTIVITIES

**Associate Editor**

❖ *Group and Organization Management.*  2004 – 2007.

**Editorial Board Member**

❖ *Journal of Management.*  2003 – present.
❖ *Group and Organization Management.*  2003 – 2004; 2007-present.
❖ *Human Resource Management.*  2003 – present.

**Doctoral Consortium Committee**

❖ Academy of Management
    ▪ Human Resources Division.  2004-2005.

**Roundtable Discussion Leader**

❖ Academy of Management Doctoral Consortium
    ▪ Human Resources Division.  2004, 2007.

**Teaching Panel Presenter**

❖ Academy of Management Doctoral Consortium
    ▪ Human Resources Division.  2005, 2006.

**Editors Roundtable Presenter**

❖ Academy of Management Doctoral Consortium
    ▪ Gender and Diversity in Organizations Division.  2005.

**Coordinator – Teaching Workshop**

- ❖ Academy of Management
  - ▪ Human Resources Division.  2001.

**Track Chair**

- ❖ Southern Management Association
  - ▪ Human Resources Division.  2000.

*Ad-Hoc* **Journal Reviewer**

- ❖ *Academy of Management Journal*

- ❖ *Assessment*

- ❖ *Group and Organization Management*

- ❖ *Human Performance*

- ❖ *Human Resource Management Journal*

- ❖ *Journal of Applied Social Psychology*

- ❖ *Journal of Business Research*

- ❖ *Journal of Human Resource Planning*

- ❖ *Journal of Management*

- ❖ *Journal of Organizational Behavior*

- ❖ *Organizational Behavior and Human Decision Processes*

- ❖ *Personnel Psychology*

- ❖ *Sex Roles*

**Text Book Reviewer**

- ❖ Dessler, G. *Fundamentals of Human Resource Management, 2nd, 3rd, and $4^{rd}$ Eds.*  Prentice Hall.  2003 - 2006

**Conference Reviewer**

❖ Innovative Teaching in HR/IR Conference.  2005.

❖ Society for Industrial/Organizational Psychologists.  1999, 2000.

❖ Academy of Management Conference
- Human Resources Division.  1994, 1999-2005.
- Gender and Diversity in Organizations Division.  2000-2001, 2005.
- Careers Division.  1996.

❖ Southern Management Association Conference
- Human Resources/Careers Division.  1994-1999, 2002-2005.
- Organizational Behavior Division.  1996.
- Women in Management Division.  1992-1994.
- Research Methods Division.  1998.

**Conference Session Chair**

❖ Academy of Management
- Human Resources Division.  2000.
- Organizational Behavior & Technology and Innovation Division.  2005.

❖ Southern Management Association
- Human Resources Division.  2002.

**Conference Discussant/Facilitator**

❖ Southern Management Association
- Human Resources Division.  1997, 1999, 2001, 2002.
- Organizational Behavior Division.  1996.
- Careers Division.  1996.
- Women in Management Division.  1993, 1994.

❖ Academy of Management
- Human Resources Division.  2001.

**Professional Committee Service**

❖ Best Paper Committee – Academy of Management Gender and Diversity Division.  2004.

❖ Executive Committee Secretary – Academy of Management Human Resources Division. 2000 – 2002.

❖ Best Student Paper Committee - Southern Management Association Conference. 1997.

❖ Member Relations Committee- Academy of Management Conference Human Resources Division. 1993.

## UNIVERSITY SERVICE ACTIVITIES

**Ongoing Activities**

❖ Academic Integrity Code Review Committee. Fall, 2006 – present.

❖ University Planning Committee for Policy on Arrangements for Maternity and Other Family Obligations. Fall, 2006 – present.

❖ Management Department Faculty Search Committee. Spring, 2006 – present.

❖ Faculty Advisory Board, Women's and Gender Studies. 2006 – present.

❖ Doctoral Program Curriculum Committee. 2004 – 2005.

❖ Undergraduate Program Committee. 2004 – 2005.

❖ Liaison, Council on Education in Management. 2003 - 2005.

❖ Conflicts of Interest and Commitment Committee. 2003 – 2005.

❖ Study Abroad Committee. 2003 – 2005.

❖ University Women's Committee. 2003 – 2005.

❖ Program Director – HRM. 2003 – 2005.

❖ Faculty Advisor – Student SHRM Chapter. 2000 – 2002.

❖ University Women's Committee (alternate). 2000 – 2003.

❖ Faculty Senate Committee on Research. 1998-2005.

❖ Full-time MBA Curriculum Committee. 1999 – 2000.

❖ Cohort MBA Curriculum Redesign Committee. 1997-1999.

❖ Department of Management Science Annual Retreat Planning Committee. 1998.

❖ MBA Core Faculty Meetings. 1997-2000.

❖ Faculty Advisor - School of Business and Public Management Leadership Retreat.  1997-
1998.

❖ BBA Core Faculty Meetings.  1996-2005.

**One-Time or Periodic Activities**

❖ Faculty Presenter – MBA Orientation.  Fall, 2006.

❖ Faculty Presenter – GMU, GWU, UMD I/O-HR Brown Bag Series.  Spring, 2004.

❖ Faculty Presenter – First Year Development Program.  Spring, 2001, Spring, 2002, Spring,
2003.

❖ Presenter – Management Science Department-wide Doctoral Seminar.  Fall, 2003.

❖ Faculty Facilitator/Assessor – Graduate Teaching Assistantship Practicum.  Fall, 2003.

❖ Faculty Advocate – SBPM Distinguished Scholar Award (Jessica Toplin, nominee).  2003.

❖ Search Committee for Center for Excellence in Municipal Management Director.  2002.

❖ Faculty Judge – Undergraduate capstone assessment.  Spring, 2002.

❖ PMBA – "Customize Your MBA" program – Representative for HR group.  Fall, 1998, Fall,
2001, Spring, 2002.

❖ Designed and presented JOBS (Junior Options for Business Success) Workshop.  Spring,
2001.

❖ Undergraduate Programs Field Day – Presented information about HR field.  Spring, 2001,
Spring, 2002

❖ Search Committee for Graduate Career Center Assistant Director.  Summer, 2000.

❖ MBA Specialization Discussion and Reception – Representative for HR group.  Spring,
1999.

❖ KPMG National Case Competition – Faculty Host.  Spring, 1999.

❖ Cohort Team Assessments - Coaching and counseling session.  Fall, 1998.

❖ Speaker at Washington Human Resource Forum - Generation X Views on Business and Work Issues. Fall, 1998 .

❖ Moderator/Facilitator, EDS Consulting Week - Performance Management. Spring, 1998.

❖ Faculty representative for Open House for newly-admitted MBA students. Spring, 1997.

❖ Faculty representative for Family weekend for prospective undergraduate students. Fall, 1996.

**Media Coverage**

❖ *Atlanta Journal-Constitution* – Interviewed for an article on age discrimination in the workplace. December, 2007.

❖ *Firstline* – Interviewed for an article on sexual harassment in the workplace. December, 2007.

❖ *California Executive* – Interviewed for an article on obesity in the workplace. Appeared September, 2007.

❖ *American Banker* – Interviewed for an article on diversity of bank Boards of Directors.

❖ *The Washington Examiner* – Interviewed for an article on absenteeism. Appeared August 4, 2006.

❖ *Entrepreneur Magazine* – Interviewed for an article on hiring former dot-com employees. Appeared Fall, 2001.

❖ *Dateline, NBC* – Interviewed for a network television news piece on age discrimination. Aired July, 1999 and September, 1999.

❖ *KONA-TV* - Interviewed for local affiliate television news piece on sexual harassment. Summer, 1998.

❖ *The Federal Times* - Interviewed for an article on employee absenteeism. Fall, 1997.

CONSULTING, TRAINING, AND SPEAKING ACTIVITIES

❖ Expert Witness – Provided statistical analyses and interpretations of salary and promotion data for a gender discrimination case. 2007.

❖ Accenture/ United States Postal Service –External consultant for Accenture's selection proposal for the USPS. 2005.

❖ Center for Excellence in Public Leadership – Designed and delivered a senior executive development workshop for upper-level public managers in DC government. 2005.

❖ Council of Governments – Designed and delivered training workshop for mid- to upper-level government managers in VA, MD, and DC. 2005.

❖ Center for Excellence in Public Leadership – Designed and delivered training workshop for mid- to upper-level public managers in DC government. 1998, 2005.

❖ Craig Capital – Performed supervisor-subordinate coaching. 2004.

❖ Expert Testimony – Provided job analysis expertise for case involving INS requirements for working in the United States. Serge Bauer, P.C. 2003.

❖ Expert Testimony – Provided job analysis expertise for case involving INS requirements for working in the United States. Serge Bauer, P.C. 2003.

❖ Expert Testimony – Reviewed testimony to prepare for settlement in case involving a negligent hiring claim. Leffler & Hyland, P.C. 2001.

❖ JOBS (Junior Options for Business Success). Designed and delivered workshop for job-seeking undergraduates. George Washington University. Spring, 2001.

❖ "The Use of Personality Tests in Employment" luncheon speaker. Society of Consumer Affairs Professionals. Spring, 2000.

❖ Group Dynamics and Teambuilding. Designed and delivered workshop for incoming MBA students. George Washington University. Fall, 1999, Spring, 2000, Fall, 2000, Spring, 2001, Fall, 2002.

❖ "Dancing in the Minefields: Managing Employee Performance and Compensation." Designed and delivered training for MBA residency. George Washington University. Spring, 1999.

❖ Tri-Way Enterprise, Inc. Designed and delivered Human Resources and Employee Motivation Workshop to Chinese delegation of accounting and finance professionals. Fall, 1998.

❖ "Generation X Views on Business and Work Issues" panel discussion. Washington Human Resource Forum. Fall, 1998.