# EXHIBIT
# B

**2/14/2008  Goldberg, Caren**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

EDWARD M. SULLIVAN,

              Plaintiff,

                             07-CV-00003

       -against-          (BSJ)(KNF)

JEFFREY BRODSKY, ERIC KAYNE, and,

MORGAN STANLEY,

              Defendants.

-------------------------------------x

              February 14, 2008

              9:39 A.M.

         Deposition of CAREN GOLDBERG, Ph.D.,

taken by Defendants, pursuant to Agreement, at the

offices of Morgan, Lewis & Bockius LLP, 101 Park

Avenue, New York, New York, 10178, before Angela

Castoro, a Registered Professional Reporter and

Notary Public within and for the State of New

York.

**2/14/2008  Goldberg, Caren**

```
1                    C. Goldberg
2         A.    Yes.
3         Q.    It is also important that you
4    provide verbal responses since this is be
5    recorded.  Nodding is, you know, not helpful,
6    a-ha or other similar gestures is not helpful
7    as well.  We need yes or no or everything to
8    be a verbal response.  Do you understand that?
9         A.    Yes.
10        Q.    Do you understand that all the
11   answers that you will be giving here today is
12   provided as under oath and at the risk of
13   perjury if you should be dishonest in your
14   answers?
15        A.    Yes.
16        Q.    That is the same weight as if you
17   were testifying in a court of law.  Do you
18   understand that?
19        A.    Yes.
20        Q.    Have you ever been deposed
21   before, Dr. Goldberg --
22        A.    No.
23        Q.    -- in any matter?
24        A.    No.
25        Q.    Have you ever been a plaintiff or
```

1                    C. Goldberg

2    defendant in a lawsuit?

3         A.    I have.

4         Q.    And what was the nature of that

5    action?

6         A.    That's something that you

7    probably need to subpoena.

8               MR. KAPLAN:  I ask that you

9               instruct your client to answer the

10              question.

11        Q.    You don't have --

12        A.    I have a confidentiality

13   agreement.

14        Q.    I am asking the nature of the

15   action.

16        A.    Sexual harassment suit.

17        Q.    That you were the plaintiff or

18   defendant?

19        A.    Plaintiff.

20        Q.    And you were not deposed in that

21   matter?

22        A.    No.

23        Q.    And when was that?

24        A.    2004,' 05.  I am not really sure.

25        Q.    That was against George

**2/14/2008  Goldberg, Caren**

1                    C. Goldberg

2           Q.    In any of the publications that

3     you drafted that were peer reviewed, did you

4     ever take a specific case, manager acts and

5     employee Y and discuss whether manager acts

6     were relying upon stereotypes in making

7     decisions about employee Y?

8           A.    I understand the question.  No,

9     that's not the type of research that I do.

10          Q.    Okay.  So you cannot do that?

11          A.    Correct.

12          Q.    Have you ever read any

13    peer-reviewed article or anyone else gave a

14    specific explanation of determining whether

15    manager X used stereotypes in his decisions

16    about employee Y?

17          A.    Actually, something like that

18    would not appear in a peer-reviewed article in

19    my field.

20          Q.    Okay.

21          A.    Because the peer-reviewed

22    articles or peer-reviewed journals in my field

23    really focus on -- there are several criteria

24    that make for good research, and one of them

25    is the extent to which you can generalize

**2/14/2008  Goldberg, Caren**

```
1                    C. Goldberg

2     findings to the population.  And if you are

3     talking about an idiosyncratic case, you can't

4     generalize it to the population.

5          Q.    You can't, right?

6          A.    You cannot.

7          Q.    Okay.  I am going to get to the

8     specifics of the report that you prepared in

9     this case in a little bit.  But isn't that

10    exactly what you did in your report, that you

11    took an individual case and based it on

12    generalities?

13         A.    No.

14         Q.    No?

15         A.    No.

16         Q.    Explain to me how that's not the

17    case, that you are not taking a specific case

18    and basing it upon generalities.

19         A.    I don't think the generalities

20    are society general or what you are calling

21    generalities.  What do you mean by

22    "generalities"?  Let me backtrack.

23         Q.    You know what, I will cover that

24    when we get to the report.

25                    You do make in this report that
```

```
 1                    C. Goldberg
 2    you prepared in connection with this case a
 3    specific finding about how a specific manager
 4    relied upon stereotypes on a specific
 5    employee, correct?
 6         A.    Yes.
 7         Q.    You never did that in any of your
 8    other articles or research or studies,
 9    correct?
10         A.    Actually, I have done it before
11    when I did the Dateline NBC interview.
12         Q.    I am not talking about Dateline
13    interviews.  I am talking about in your
14    scholarly work, have you ever drafted any
15    articles, published any articles, done any
16    studies where you scientifically took your
17    knowledge and made an assessment that a
18    specific manager was using stereotypes against
19    a specific employee?
20         A.    Well, that wouldn't be
21    scientific.
22         Q.    It wouldn't be scientific to do
23    that?
24         A.    In an academic sense.  Because
25    when we publish in peer-reviewed journals, one
```

**2/14/2008  Goldberg, Caren**

| | |
|---|---|
| 1 | C. Goldberg |
| 2 | of the criteria is whatever we do has to be |
| 3 | something that's replicable by somebody else |
| 4 | and you can't have one person make one |
| 5 | observation about somebody and another |
| 6 | researcher replicate it because the other |
| 7 | researcher doesn't have the same data. |
| 8 | Q.    But I believe that you said that |
| 9 | it would not be scientific or you cannot -- |
| 10 | A.    In the academic sense. |
| 11 | Q.    Let me just finish the question. |
| 12 | A.    Sorry. |
| 13 | Q.    In the academic sense, you cannot |
| 14 | scientifically make any determinations about |
| 15 | how a specific manager used stereotyping |
| 16 | against a specific employee, correct? |
| 17 | MR. WELZER:  Objection. |
| 18 | A.    I think you have actually mixed |
| 19 | my words a little bit. |
| 20 | Q.    Then correct me. |
| 21 | A.    Actually, tell me what you said |
| 22 | again.  Can you read back what he said? |
| 23 | Because I had something that I was going to |
| 24 | respond to and I lost what it was. |
| 25 | MR. WELZER:  Also, Seth, we have |

1              C. Goldberg

2         been going from my watch about an hour

3         and six minutes.  Whenever you find a

4         good time for a break, let's take one.

5              And also Dr. Goldberg, if you

6         need a break for any reason, just let

7         us know.

8              THE WITNESS:  Okay.  After this

9         question would be good for me.

10             (Record read.)

11        A.    Actually, it is not that you

12   can't make that determination, but it is just

13   not something that would be publishable in a

14   journal.

15        Q.    Why would it not be publishable

16   in a journal?

17        A.    Because journals publish things

18   that can be generalized or I should say

19   journals that publish empirical research, and

20   that's the kind of research that I generally

21   publish and that's generally what most

22   peer-reviewed journals are.

23        Q.    And is the example we're talking

24   about here nonempirical?

25        A.    Correct.

**2/14/2008  Goldberg, Caren**

```
1                    C. Goldberg
2          Q.    Based on what statistics?
3          A.    Based on statistics.
4          Q.    In that report did you make any
5    conclusions about whether a specific employee
6    in any school was the victim of
7    discrimination?
8          A.    No.  That's not what I was asked
9    to do in that particular case.
10         Q.    Could you, based on the
11   statistics that you had, make any
12   determinations about a particular employee if
13   you had no other information about whether any
14   given employee was the victim of
15   discrimination?
16         A.    No.  Not that I couldn't, but
17   that it can't be done.
18         Q.    Did you prepare an expert report
19   in any other case that you served as an expert
20   on?
21         A.    No.
22               Can I clarify something that
23   occurred before the break, because it goes
24   back to this generalized thing.  I had a hard
25   time really understanding what you were
```

**2/14/2008  Goldberg, Caren**

1           C. Goldberg

2     getting at, but as I was on my way to the

3     bathroom it kind of occurred me that I think I

4     can clarify things a little bit better.

5              You had asked me about drawing a

6     conclusion in the specific case and Frank had

7     objected, although I understood you to mean

8     Mr. Gorman's decision to terminate Ed

9     Sullivan, but what I wanted to get at was in

10    any Social Science Journal, you would never

11    have that, something like that published

12    because one of the criteria or one of the

13    standards for publishing is that something be

14    falsifiable.

15             And if you have a specific case,

16    it cannot be falsified because if I make the

17    assessment that Mr. Gorman discriminated

18    against Ed Sullivan and then another

19    researcher behind me, you know, a couple of

20    years, months, however later, looks at a

21    specific discrimination case and they

22    determine that there was no discrimination,

23    that hasn't falsified what I have done because

24    their case has very idiosyncratic

25    particularities, just as this case has very

1                    C. Goldberg

2      idiosyncratic particularities.

3                    So for that reason, journals in

4      my field don't publish specific case sorts of

5      things.  Because they are not falsifiable and

6      that's kind of one of the criteria for good

7      science.

8           Q.    When you say "falsifiable," what

9      do you mean?

10          A.    That means I find something, you

11     know, in my sample of, you know, 300 new hires

12     at an organization and then you're studying

13     the same thing, you know, at a different

14     organization using, you know, a different

15     number, for that matter new hires, and you

16     don't find the same thing.

17                   Well, then that's falsifiable,

18     because then if I did find significant effects

19     and you don't, then we can say okay, well,

20     whatever I found doesn't generalize.  There is

21     some boundary condition on it.

22                   It is kind of incumbent on the

23     people who are standing on my shoulders, if

24     you will, to come back and say okay well, you

25     know, Goldberg found this, I didn't find this.

**2/14/2008  Goldberg, Caren**

```
1              C. Goldberg
2      Well, why didn't I find this?  Well, maybe
3      there is something about my samples, so maybe
4      it occurs in the legal field, but it doesn't
5      occur in academia.
6          Q.    You are giving an example, if I
7      understand you correctly, when you say whether
8      it is falsifiable, do you mean whether someone
9      else has the ability to check it for accuracy?
10         A.    Not to check the finding, but to
11     check the generalizability.
12         Q.    Just using what you start as the
13     premise, it's your finding that Mr. Gorman
14     used stereotypes in terminating Mr. Sullivan?
15         A.    Correct.
16         Q.    That finding is not falsifiable,
17     correct?
18         A.    Correct.
19         Q.    There is no one that can come
20     back and say, I have done this analysis and
21     because of X, Y, Z, Dr. Goldberg, you're
22     wrong, correct?
23         A.    Actually, I think you put words
24     in my mouth.  People can always come back and
25     claim that I am wrong.
```

```
 1                    C. Goldberg
 2          Q.    Then just to streamline this,
 3     define "falsifiable."
 4          A.    Okay.  Falsifiable means that you
 5     have a hypothesis, you test that hypothesis
 6     using data and somebody else comes behind you
 7     and retests that same hypothesis using
 8     different data.  I think the key is here that
 9     it is a different data set or different data
10     points.  And, therefore, they may not find --
11     if they don't find the same thing, then that
12     suggests that there is some boundary condition
13     on the support for that hypothesis.
14          Q.    And in this case there could be
15     no different data to examine to test the
16     validity of your conclusion; is that right?
17          A.    No.  There is always -- I mean,
18     you could look at any other age discrimination
19     case.  But if somebody behind me looks at, you
20     know, did, you know, Mr. Smith discriminate
21     against Mr. Jones on the basis of age, well,
22     the conditions surrounding that specific case
23     are very different than this situation
24     surrounding this specific case with Mr.
25     Sullivan.
```

**2/14/2008  Goldberg, Caren**

1                    C. Goldberg

2          Q.    Right.  Just to follow through

3    your point then, there is no way to test with

4    anybody else the accuracy of your conclusions;

5    is that right?

6                    MR. WELZER:  Objection.

7          A.    It is not a test of all

8    hypothesis.  I didn't go in with a hypothesis

9    that Mr. Sullivan was discriminated against on

10   the probability of less than or equal to .05,

11   which is the kind of hypothesis test in this

12   empirical research.  This isn't empirical

13   research case.

14         Q.    Okay.  So this is not an

15   empirical research case.  So there is no

16   specific scientific methods that you used to

17   come to your conclusion here, correct?

18         A.    That's not correct.

19         Q.    Well, if it is not empirical,

20   what could you mean by that?

21         A.    Well, you could come to

22   conclusions through induction, you could come

23   to conclusions through deduction.

24         Q.    What did you use here?

25         A.    Here, I used induction.  I mean,

```
 1                  C. Goldberg
 2      there is plenty of research suggesting what
 3      constitutes stereotypes.  There is plenty of
 4      evidence in the research literature sort of
 5      based on hypothesis testing of what the
 6      stereotypes concerning older workers are.
 7      So based on that and based on the evidence
 8      provided in the depositions that I read and
 9      the exhibits, I base my -- I formed my
10      conclusion.
11              Q.    You formed a conclusion, but it
12      is not based on a scientific method, correct?
13              A.    No, that's not correct.
14      Induction is a scientific method, it is just
15      not -- it is just not empirical.
16              Q.    Then define induction for me as
17      you understand that.
18              A.    Induction is taking existing
19      foundations and extending them to a new
20      situation.
21              Q.    To a specific individual case?
22              A.    Could be, need not be.
23              Q.    Well, is there any scientific
24      method that you are aware of that you take
25      existing foundations that you were describing
```

**2/14/2008  Goldberg, Caren**

```
1                    C. Goldberg
2          Q.    At this point you don't even know
3    what you are to be used as an expert witness
4    for?
5          A.    I know that it is an age
6    discrimination case.
7          Q.    I understand that you know it is
8    an age discrimination case.  But your
9    testimony, if I am not mistaken, up until this
10   point you have no idea -- how or why they are
11   going to use your services, correct?
12         A.    Well, I think it was pretty clear
13   that they wanted me to write an expert report
14   and that they would want me to be deposed and
15   that there would be a possibility of being on
16   the witness stand.
17         Q.    Okay.  So was that discussed in
18   your first conversation with plaintiff's
19   counsel?
20         A.    Yes.
21         Q.    I asked you this before, what did
22   plaintiff's counsel tell you that they wanted
23   you to write a report about?
24              MR. WELZER:  Objection.  She
25         answered that before.
```

1                    C. Goldberg

2                    MR. KAPLAN:  I don't think she

3          did.

4                    MR. WELZER:  She did.

5                    MR. KAPLAN:  I am going to ask

6          you again because I didn't hear.

7                    MR. WELZER:  Asked and answered.

8          A.     They wanted my expert opinion as

9     to whether there was age discrimination.

10         Q.     In this specific case?

11         A.     In the case of Mr. Sullivan

12    against Morgan Stan or -- I guess it is

13    technically Brodsky et al.

14         Q.     And they asked you to write a

15    report on that topic?

16         A.     Correct.

17         Q.     Did they ask you to write whether

18    stereotypes were or were not an issue in the

19    determination?

20         A.     No.

21         Q.     It was just whether age

22    discrimination was the cause of Mr. Sullivan's

23    termination?

24         A.     Correct.

25         Q.     And then when you got the

```
1                    C. Goldberg
2      communication from RTG saying that they wanted
3      to retain you, what was your response?
4           A.    I don't know if I had a separate
5      e-mail or in their e-mail indicating that then
6      they attached a contract.  So I have a
7      contract with RTG.
8           Q.    Do you still have a copy of that
9      contract?
10          A.    Yes.
11          Q.    Does it say in that contract the
12     purpose of your retention?
13          A.    No.
14          Q.    As far as you know, though, the
15     only reason why you were being retained as an
16     expert witness was to render an opinion on
17     whether Mr. Sullivan was the victim of age
18     discrimination; is that right?
19          A.    Correct.
20          Q.    So you were retained to offer an
21     opinion on whether Mr. Sullivan was subject to
22     any type of hostile work environment claim,
23     correct?
24          A.    Correct.
25          Q.    And you weren't retained to
```

```
1                   C. Goldberg
2       it possible that you looked at other things
3       and you are just not recalling them?
4            A.    It is possible.
5            Q.    Sometimes when you do the studies
6       or prepare reports like this, you state the
7       items that you considered and may or may not
8       have looked at other ones?
9            A.    Well, I do research on this sort
10      of thing, so I am always looking at those.  So
11      it is kind of hard to say okay, well, I am
12      only going to think about this -- I am hand
13      gesturing, sorry.
14               I am only going to think about
15      this as it relates to this particular thing
16      that I am working on now.  And I am only going
17      to read this and digest the information as it
18      pertains to something else, because if I am
19      reading something -- I do research on older
20      workers and age stereotypes.  I can't say that
21      I reviewed it without the intent, with or
22      without the intent of using it --
23           Q.    I am trying going to try to
24      simplify this for you.  In this case you list
25      certain materials that you reviewed on page 5
```

1                    C. Goldberg

2       of the report.  As you sit here today, is

3       there anything that's not listed on page 5

4       that you reviewed in determining the results

5       of your report here?

6            A.    No.

7            Q.    Okay.  Who provided you with the

8       materials you cited here?

9            A.    Well, Zuckerman Gore Brandies

10      provided me with the depositions and the

11      exhibits.  And the scholarly articles are

12      things that I either had already through my

13      research or things that I remembered having

14      read, and I may have sort of checked up on

15      follow-up research in that area.

16           Q.    Let's put the articles aside for

17      a second.  Let's look at the deposition

18      transcripts and the exhibits.

19           A.    Okay.

20           Q.    How is it determined which of

21      those transcripts and exhibits you would look

22      at?

23           A.    It was a fairly random process.

24           Q.    What does that mean?

25           A.    That means -- I guess initially I

```
 1                    C. Goldberg
 2     probably looked at the skinniest one first, so
 3     I could feel like I reached a sense of closure
 4     on something.
 5           Q.    Let me stop you for a second.  I
 6     am not asking for the order.  I am saying
 7     which materials that you reviewed, who
 8     determined which materials you were going to
 9     review to come up with your conclusion about
10     age discrimination in this case?  Who decided
11     that you would look at these specific
12     transcripts and exhibits?
13           A.    I have no idea.  That's what was
14     sent to me.
15           Q.    By plaintiff's counsel?
16           A.    Correct.
17           Q.    Okay.  Did they give you the
18     deposition transcripts in full?
19           A.    Yes.
20           Q.    Or they were just excerpts?
21           A.    No, they were in full.  Certainly
22     felt like it when I was reading it.  I am
23     assuming they were pretty long.
24           Q.    What about the exhibits, you
25     mentioned that you reviewed:
```

**2/14/2008 Goldberg, Caren**

```
1                  C. Goldberg
2              "Most of the plaintiff's exhibits
3          referenced in these transcripts."
4              Who decided which of those
5      exhibits that you looked at?
6          A.    I am assuming plaintiff's counsel
7      did.
8          Q.    It wasn't you?
9          A.    I read what was sent to me or I
10     looked at what was sent to me.
11         Q.    Did you ever ask to review
12     anything else other than what was sent to you?
13         A.    I did, actually.  There was one
14     thing that I can't remember what it was, but
15     there was an exhibit referenced and it was
16     probably very early -- I shouldn't say
17     probably.  It was very early on in the process
18     and I called and I said, you know, I am
19     missing exhibit such and such.
20             And Frank told me that I probably
21     don't need, you know, every single exhibit.
22         Q.    But if you thought it was
23     important to your analysis, why didn't you
24     insist on receiving it?
25         A.    I -- actually, I don't think --
```

1              C. Goldberg

2      it probably wasn't -- I don't think it was

3      important to my analysis.

4          Q.    Then why did you ask for it?

5          A.    Because this was my first time

6      providing expert testimony, so when I was

7      reading the transcript and it referenced

8      Exhibit X and I looked through the pile of

9      exhibits and couldn't find Exhibit X, I

10     thought that there was probably a mistake or a

11     clerical error.  So I was pretty much letting

12     him know that there is a clerical error and

13     we're missing that.  No, we didn't send you

14     every single exhibit.

15         Q.    It is your understanding that

16     plaintiff's counsel was making the

17     determination as to which exhibits were

18     relevant for you to look at and which ones

19     weren't, correct?

20         A.    I think they cast a pretty broad

21     net because there were plenty of things in

22     there that were not really relevant.  There

23     was a handful of things that they did leave

24     out.

25         Q.    The determination as to which

2/14/2008  Goldberg, Caren

```
 1                C. Goldberg
 2    exhibits you should look at was plaintiff's
 3    counsel, not you?
 4         A.    Yes.
 5         Q.    And the one time you asked to
 6    look at something else plaintiff's counsel
 7    told you, it probably wasn't relevant and you
 8    just let it go?
 9              MR. WELZER:  Objection.
10         Q.    Is that fair?
11         A.    Well, given how it was referenced
12    in the deposition, it didn't seem relevant.
13    But just as -- in my efforts to be thorough, I
14    noticed the -- I noticed it was missing.
15         Q.    Other than that one instance, did
16    you ask to see anything else other than what
17    they sent you?
18         A.    I did.  I asked for a list of the
19    ages of -- I think it was the ages of all the
20    regional directors and maybe the level below.
21    I can't remember what they're called.
22         Q.    Did you receive that information?
23         A.    Actually, I think that Mr. Welzer
24    pointed out that information that was in one
25    of the exhibits.
```

1               C. Goldberg

2     document or exhibit.

3          Q.    Are you aware that the deposition

4     transcripts that you received are not the only

5     depositions in this case?

6          A.    I actually received them in

7     increments, so initially I received several

8     and then later -- I guess initially maybe it

9     was just these that I received.  And then

10    later I received the transcripts of a couple

11    of other people.

12         Q.    So when I asked you before, I

13    asked you before, did you review any other

14    documents not listed in there, you said no,

15    you hadn't looked at any other?

16         A.    I hadn't looked at them.  And I

17    still hadn't looked at them.

18         Q.    Have you received other documents

19    that you did not look at?

20         A.    Yes.

21         Q.    What other documents have you

22    received that you did not look at?

23         A.    Additional deposition

24    transcripts.

25         Q.    Of who?

1            C. Goldberg

2        A.    Actually, Mr. Welzer would

3    probably know better than I would.

4        Q.    You don't even know the names of

5    the people whose deposition transcripts you

6    were sent?

7        A.    If you told me you sent a

8    deposition transcript for so-and-so, I would

9    know.  But I haven't looked at them.  So as

10   far as I saw, on the front cover sheet where

11   it says it.

12       Q.    Obviously as an expert you want

13   to give an objective opinion, do you not?

14       A.    I do.

15       Q.    Isn't it important, though, that

16   you consider all the facts and all the

17   testimony before rendering a decision?

18       A.    It is important that I get the

19   report done in a timely manner so that it

20   could be sent to you.  So at some point you

21   have to limit how much information you're

22   going to include and there was a point in time

23   where I felt that I had sufficient information

24   upon which to base my decision and that I

25   needed to reach closure.

1              C. Goldberg

2         Q.    So it was more important to meet

3    a deadline than to review all the materials

4    provided to you?

5              MR. WELZER:  Objection.

6         A.    I think that was actually a

7    tricky question.

8         Q.    I am trying to understand why you

9    didn't look at these other materials and you

10   mentioned that you had a deadline to follow.

11             Here is my question:  Did you not

12   review the other additional transcripts that

13   you were sent because you had to meet a time

14   deadline?

15        A.    I don't think I even received

16   them before I needed to send my report.

17        Q.    So did you receive these

18   transcripts after you completed the report?

19        A.    Either after or very, very

20   shortly before where I would have said, there

21   is just no way I am going to able to write the

22   report and spend another zillion hours

23   reading.

24        Q.    Were you done?

25        A.    Well, not at the time that you

1                    C. Goldberg

2    interjected, but now I am.

3         Q.    To this day, have you read those

4    deposition transcripts?

5         A.    No, I haven't.

6         Q.    Has a thought occurred to you

7    that perhaps there might be some relevant

8    information in these deposition transcripts

9    that would factor into your report?

10        A.    Sure.

11        Q.    So can you say with any type of

12   certainty that your report is based on a full

13   review of all the relevant facts, when you

14   haven't reviewed certain deposition

15   transcripts that were provided to you?

16        A.    I feel that I had more than

17   sufficient evidence from the documents that

18   were provided and I don't think that there is

19   anything from another deposition transcript

20   that would alter my assessment.

21        Q.    Without having seen what's in

22   those deposition transcripts, how do you know

23   that?

24        A.    Well, Mr. Gorman came out and

25   made several admissions to having relied on

```
1                    C. Goldberg
2    under their own sworn testimony, that wouldn't
3    affect your conclusion that Mr. Sullivan was a
4    victim of age discrimination?
5         A.    Unless it had to do with the
6    veracity of whatever I already read.
7         Q.    You don't know whether those
8    transcripts had to do with the veracity of
9    what you already read, correct?
10        A.    I don't.
11        Q.    It is possible then what is
12   contained in those transcripts might affect
13   your opinion in this report, correct?
14        A.    Yes.
15        Q.    Okay.
16              Now, you mentioned that you are
17   going to assume that the stuff that you did
18   review is accurate.  I remember you saying
19   that a couple of times, correct?
20        A.    Yes.
21        Q.    How do you know in reviewing
22   these deposition transcripts that you did read
23   that everything you read was accurate?
24        A.    It is sworn testimony and perjury
25   is a pretty serious crime.
```

2/14/2008 Goldberg, Caren

```
 1                  C. Goldberg
 2          A.    No.
 3          Q.    Did you make any efforts to
 4      ensure that the deposition transcripts you
 5      read were credible, accurate and
 6      comprehensive?
 7                  MR. WELZER:  Objection.
 8          A.    I wasn't really hired to make
 9      that assessment.
10          Q.    Well, you are making an
11      assessment based on the testimony in these
12      deposition transcripts, correct?
13          A.    Yes.
14          Q.    So isn't it an absolute
15      requirement that you feel confident that you
16      could rely upon the materials that you are
17      reading?
18          A.    I was asked to formulate an
19      opinion based on the information that I did
20      read, not to make an assessment as to the
21      veracity of the information that I read.
22          Q.    As a social scientist though,
23      isn't it important that the data that you are
24      relying upon you feel is completely accurate?
25          A.    Sure.
```

2/14/2008  Goldberg, Caren

```
 1                    C. Goldberg
 2          Q.    Did you make any efforts to
 3    ensure that the testimony in those deposition
 4    transcripts were, in fact, accurate?
 5          A.    As a first-time expert witness, I
 6    went in assuming that sworn testimony is
 7    accurate.
 8          Q.    So that would be no?
 9          A.    What would be no?
10          Q.    The answer to the question, did
11    you make any efforts to ensure that the
12    materials that you were reviewing were 100
13    percent accurate and truthful?
14          A.    No.
15          Q.    Now in deposition transcripts,
16    would you acknowledge that there is a
17    divergence of opinion as to certain facts that
18    occurred?
19          A.    Yes.
20                MR. WELZER:  Objection.
21          Q.    Okay.  If you are assuming
22    everything is 100 percent true and two people
23    can view things differently, have differing
24    testimony, how do you know which one is the
25    truth for purposes of your report?
```

```
1                 C. Goldberg
2    looking for.
3         Q.    Everything that you were looking
4    for?
5         A.    As it was referenced in the
6    transcripts.
7         Q.    Are you aware that during the
8    course of discovery, there have been thousands
9    of documents exchanged between the parties?
10        A.    I was not aware, no.
11        Q.    Now having been aware of that, is
12   it possible --
13              MR. WELZER:  Objection.
14        Q.    Now, having been aware of that,
15   is it possible that there might be relevant
16   data in those thousands of documents that you
17   weren't privy to?
18              MR. WELZER:  Objection.
19        A.    Relevant to?
20        Q.    To your determination that Mr.
21   Sullivan was the victim of age discrimination.
22        A.    Can you tell me what sorts of --
23        Q.    I am just asking about
24   possibilities.  Let me backtrack for a second.
25              Roughly how many documents, aside
```

2/14/2008 Goldberg, Caren

```
1                    C. Goldberg
2      from the transcripts, how many exhibits did
3      you review, approximately?
4           A.    Between 50 and 75, I believe.
5           Q.    50 and 75 exhibits?
6           A.    Yes.  Between 50 and 75 exhibits.
7           Q.    Did you ever ask plaintiff's
8      counsel whether there was additional documents
9      being exchanged back and forth between the
10     parties in this litigation?
11          A.    No.
12          Q.    If you knew that there were
13     thousands of other documents being used in
14     this litigation, might you want to take a look
15     at those before coming to the conclusion that
16     you did in this report?
17               MR. WELZER:  Objection.
18          A.    Can you repeat the question?  Or
19     can you read back the question?
20          Q.    I will rephrase it, actually.
21          A.    Okay.
22          Q.    You stated before that you
23     reviewed approximately 45 to 50 exhibits,
24     right?
25               MR. WELZER:  Objection.
```

**2/14/2008  Goldberg, Caren**

1                    C. Goldberg

2          A.    Excuse me, actually that's not

3    what I said.  I believe I said 50 to 75.

4          Q.    50 to 75 exhibits, okay.

5                Now if you knew that there were

6    hundreds of thousands of documents being

7    exchanged between the parties in this

8    litigation, would you want to review those

9    documents, at least some of them, all of them

10   before coming to your conclusion that you did

11   in this report?

12               MR. WELZER:  Objection.

13         A.    If I had an infinite period of

14   time to do the report, and if I -- if there

15   was -- I don't think there was any specific

16   questions where I said, help, if only knew

17   blah, blah, blah.

18         Q.    I understand you don't know

19   what's in the content of these other

20   documents.  But you are making a conclusive

21   determination that Mr. Sullivan was terminated

22   because of his age, correct?

23         A.    Yes.

24         Q.    Might there be data contained in

25   these other thousands of documents that were

**2/14/2008  Goldberg, Caren**

1              C. Goldberg

2    exchanged that might affect your opinion as to

3    whether Mr. Sullivan was terminated because of

4    his age?

5              MR. WELZER:  Objection.

6         Q.    Is it possible?

7         A.    It is possible.

8         Q.    So it is possible that there

9    could be data in these other documents which

10   would explain other reasons, possible other

11   reasons for Mr. Sullivan's termination?

12             MR. WELZER:  Objection.

13        A.    Well, I think the information

14   that's provided in the documents that I have

15   make clear that age was part of the equation.

16   Additional documents may alter the extent to

17   which I feel that age played a factor, but age

18   played a factor.

19        Q.    But could there have been

20   documents that you see that might have changed

21   your mind?

22        A.    Possibly.

23        Q.    The articles that you reviewed in

24   preparing the report, how did you select the

25   articles that you were using in this report?

**2/14/2008  Goldberg, Caren**

```
1                    C. Goldberg

2          A.    A lot of stuff I sort of have

3    floating in my head from doing research in the

4    area.  So, I mean, I could sort of say off the

5    top of my head, oh, older workers in

6    trainability, these are researches that I have

7    done studies on that stereotype.

8          Q.    I have a quick question for you.

9                MR. WELZER:  I am sorry, are you

10         done answering?

11               MR. KAPLAN:  I thought she was

12         done.  If you are not done --

13               MR. WELZER:  You keep saying you

14         thought she was done when it is clear

15         that she wasn't done.

16               MR. KAPLAN:  I thought that she

17         was done.  I do not mean to be rude.  I

18         apologize.

19         Q.    Please continue your answer.

20         A.    Okay.

21         Q.    You had said that some of these

22   studies were "floating around in your head,"

23   you just used that phrase.  Do you need her to

24   repeat it?

25               (Record read.)
```

1                   C. Goldberg

2          Q.    When you used that terminology,

3    "floating around in your head," are you basing

4    that on any type of stereotypes?

5          A.    I actually knew this question was

6    going to come up when you asked me about the

7    phraseology.

8                   No, we call it walking around

9    knowledge.  Just like you --

10         Q.    I am sorry, go ahead.

11         A.    It has nothing to do with

12   stereotypes in this context?

13         Q.    In this context.  How do you know

14   whenever anyone using the term "stuff floating

15   around in their head," that it's necessarily

16   relied upon stereotypes?

17         A.    Well, it has -- whether it has to

18   do with an individual's membership in a

19   particular category and whether it has to do

20   with an individual's perception of what fits

21   in a particular category.

22         Q.    Would you agree that every time

23   someone using the term "stuff floating around

24   in their head," they are not necessarily

25   invoking any stereotypical thoughts, would you

**2/14/2008  Goldberg, Caren**

1          C. Goldberg

2   agree?

3          A.   Every time, well, I would

4   never -- I would probably not agree to every

5   time.

6          Q.   In fact, you just said you used

7   that term and you were not referring to any

8   stereotypes, correct?

9          A.   That is correct.

10         Q.   So how is it that you could ever

11   say that when a specific person uses the term

12   something about "bits of information floating

13   around in their head," that it automatically

14   relies upon stereotypes?

15         A.   In the context in which Mr.

16   Gorman said it, he was referring to bits of

17   information floating around in his head as to

18   what fit in the organization and bits of

19   information floating around in his head as to

20   Mr. Sullivan's characteristics or his

21   impressions -- actually, I think he said my

22   gut instinct, my judgment, my initial

23   judgment.  He said several things.

24         Q.   How do you know when Mr. Gorman

25   said he is relying on bits of information in

2/14/2008  Goldberg, Caren

```
1                    C. Goldberg

2        A.     Yes.

3        Q.     You were co-author for that

4   article:

5               "Work Attitudes and Decisions as

6        a Function of Manager Age and Employee

7        Age."

8               Is that right?

9        A.     Yes.

10        Q.     What was your role in that

11   article?

12        A.     Actually I coded -- because this

13   started, this was a probably an eight-year

14   process.  So it started back when I was in

15   graduate school.  So I coded all the data,

16   made sure that all the data were accurate.  I

17   analyzed the data.  And in writing the paper

18   itself, did several series of round robins.

19        Q.     When you prepared the reports,

20   kind of like the ones that you drafted in this

21   case, is it important that the articles and

22   studies you rely upon are accurate and up to

23   date?

24        A.     Say that again.

25               MR. WELZER:  Objection.
```

1                    C. Goldberg

2    article to be a reliable source of research

3    today?

4           A.    A reliable source?

5           Q.    Yes.

6           A.    Can you say what you mean --

7    reliable means something specific to mean in a

8    statistical sense.

9           Q.    Well, you cite this article as an

10   example over and over again as authority for

11   the proposition that age stereotypes are

12   prevalent in the workplace, do you not?

13          A.    Yes.

14          Q.    So you cite that as support for

15   your statement, do you not, that age

16   stereotypes are prevalent in the workplace, do

17   you not?

18          A.    Yes.

19          Q.    Do you think, as we is sit here

20   today in 2008, that you could still rely upon

21   that article for the proposition that age

22   stereotypes are very prevalent in the

23   workplace?

24          A.    Yes.

25          Q.    And that article was published in

1              C. Goldberg

2    the Journal of Applied Psychology?

3         A.    Yes.

4         Q.    Are you familiar with that

5    publication?

6         A.    Yes.

7         Q.    Is that considered a reliable

8    source?

9         A.    Actually, that is probably --

10   depending on who you ask and who ranks it, the

11   top if not -- one of the top, if not the top,

12   journal in my field.

13        Q.    Are you aware of an article

14   published in 2004 in the Journal of Applied

15   Psychology by E.M. Wise and T.J. Mauer called,

16   "Age Discrimination in Personnel Decisions, a

17   Reexamination"?

18        A.    I'd have to see an abstract of

19   it.  I read a lot of Todd Mauer stuff.  I am

20   not 100 percent sure if that's among the stuff

21   of his that I read or not.

22        Q.    Which?

23        A.    Todd Mauer.

24        Q.    Todd Mauer.  You are familiar

25   with Todd Mauer, you are not sure whether you

2/14/2008 **Goldberg, Caren**

1                    C. Goldberg

2     read the specific article?

3          A.    I read a lot of his work and I

4     can't tell you whether I read that one

5     specifically or not.

6          Q.    I am going to read you a small

7     excerpt from that article from page 1554 of

8     that article.

9                Again, the article called "Age

10    Discrimination and Personnel Decisions:   A

11    Reexamination." In that article Mr. Mauer

12    states as follows:

13                "Far fewer significant effects

14          were found in this study than were

15          originally reported in the original

16          Rosen and Jerde 1976 study.   One

17          possibly explanation for the results is

18          that there simply is not as much age

19          discrimination now as there was in the

20          mid-1970s."

21                Have you heard about this study

22    before?

23          A.    That really doesn't tell me a

24    whole lot, but interestingly Mauer just wrote

25    an article two years ago, I want to say,

1                      C. Goldberg

2      it mean -- kind of what I said before, has --

3      if I were a reviewer or in my role as an

4      editor, and then if somebody didn't find

5      support for previous been well-supported, my

6      first reaction is to look at the different and

7      the current study or studies, if you suggested

8      multiple, to say, you know, what are the

9      differences and how are these studies are

10     being conducted?  Are they using similar

11     samples, occurring in similar industries, are

12     the ages or targets different?

13          Q.    In this report that you prepared,

14     you did not even cite or address these more

15     recent articles that talk about the lack of

16     stereotyping in the workplace; isn't that

17     right?

18               MR. WELZER:  Objection.

19          A.    Can you read that back?

20               MR. KAPLAN:  I am going to

21          withdraw the question.

22          A.    Okay.

23          Q.    Before preparing your report, did

24     you ever meet Mr. Sullivan?

25          A.    No.

```
 1                    C. Goldberg
 2          Q.    Did you ever speak with him?
 3          A.    No.
 4          Q.    Did you have any interaction with
 5   Mr. Sullivan at all?
 6          A.    Never met him until today.
 7          Q.    Ever see a photo of him?
 8          A.    No.
 9          Q.    Did you ever hear an audiotape of
10   what he sounds like?
11          A.    No.
12          Q.    Did you ever conduct any studies
13   on how other people perceived Mr. Sullivan?
14          A.    Well, this kind of goes back to
15   the same issue that we talked about this
16   morning.  A study to me is a very specific,
17   has a very specific meaning.  And Ed Sullivan
18   is only one observation.  So....
19          Q.    Other than reading the deposition
20   transcripts that you read, did you do any
21   independent analysis of how Mr. Sullivan's
22   co-workers perceive him?
23          A.    No.  That wasn't really what I
24   was asked to opine on.
25          Q.    Do you know, having just met Mr.
```

2/14/2008  Goldberg, Caren

```
 1                    C. Goldberg
 2     Sullivan before writing this before comes from
 3     what you read in those transcripts and the
 4     exhibits?
 5          A.    Yes.
 6          Q.    Did you ever meet Mr. Gorman?
 7          A.    No.
 8          Q.    Have you ever spoken with him?
 9          A.    No.
10          Q.    Any interaction with Mr. Gorman
11     at all?
12          A.    No.
13          Q.    Have you ever seen a photo of
14     him?
15          A.    Yes.
16          Q.    You have seen a photo of Mr.
17     Gorman?
18          A.    After writing my report, yes.
19          Q.    Before you wrote your report, did
20     you see a photo of Mr. Gorman?
21          A.    No.
22          Q.    Have you had any opportunity,
23     outside of reading the deposition transcripts,
24     to observe any type of interactions between
25     Mr. Gorman and Mr. Sullivan?
```

1                    C. Goldberg

2          A.    Say that again.

3          Q.    Have you ever observed Mr. Gorman

4    with Mr. Sullivan?

5          A.    No.

6          Q.    Is it correct to say that your

7    only knowledge of Mr. Gorman comes from what

8    you read in the selected deposition

9    transcripts?

10          A.    What do you mean by "selected

11    deposition transcripts"?

12          Q.    You stated before you did not

13    read all those deposition transcripts in this

14    case.

15          A.    Okay.  So, yes, my only knowledge

16    of Mr. Gorman comes from the transcripts that

17    I read.

18          Q.    Did you ever meet Ms. Stilwell?

19          A.    No.

20          Q.    Did you ever speak with her?

21          A.    No.

22          Q.    Did you ever have any interaction

23    with her?

24          A.    No.

25          Q.    Did you ever see a photo of her?

1                    C. Goldberg

2         A.    No.

3         Q.    Do you know whether she looks her

4    age?

5         A.    No idea.

6         Q.    No idea.

7         A.    Actually us -- excuse me,

8    somebody in their deposition, it was Mr.

9    Gorman, was asked to estimate how old several

10   people were and one of them was Ms. Stilwell

11   I can't remember what his answer was, but I

12   remember him saying that he was always told

13   not to guess a woman's age.

14        Q.    I am asking you, do you have any

15   idea whether Ms. Stilwell looks her age or

16   not?

17        A.    Other than from what Mr. Gorman

18   said which I don't remember at this particular

19   moment in time, no.

20        Q.    But what you said Mr. Gorman said

21   was that he is not supposed to comment on a

22   woman's age?

23        A.    But then he was directed to

24   answer.

25        Q.    Okay.  What you are describing is

**2/14/2008  Goldberg, Caren**

1              C. Goldberg

2         information, as provided."

3              Do you see that sentence?

4    A.    Yes.

5    Q.    Have you conducted any further

6    work since you completed this report?

7    A.    No, I have not.

8    Q.    So what other work are you

9    anticipating?

10   A.    It is possible that I may review

11   the additional transcripts that were sent to

12   me.  And it is possible that I may review the

13   additional exhibits.

14   Q.    Why would you do that?

15   A.    If this were to go to trial.

16   Q.    Right.  Okay.  If this would go

17   to trial, what?

18   A.    I would probably have more time

19   to consider additional information.

20   Q.    Why would you need to consider

21   additional information?

22        MR. WELZER:  Objection.

23   A.    I didn't say that I did need to.

24   Q.    You said if this goes to trial,

25   you might read the other exhibits and other

1                    C. Goldberg

2    Sullivan?

3         A.    Yes.

4         Q.    So is it your understanding that

5    knowing the plaintiff's counsel represents Mr.

6    Sullivan, that when they are asking you to

7    render an opinion as to whether age

8    discrimination occurred, they would like you

9    to come out on the side that age

10   discrimination did occur?

11        A.    That's kind of irrelevant.  My

12   professional reputation is far more important

13   than $250 an hour.

14        Q.    You didn't answer the question.

15        A.    Okay.

16        Q.    Knowing that plaintiff's counsel

17   represents Mr. Sullivan, was it your

18   understanding as a professional that the way

19   they would like you to come out is to find

20   that Mr. Sullivan was the victim of age

21   discrimination?

22        A.    Sure.

23        Q.    What efforts did you take to make

24   sure that your report wasn't the result of any

25   type of confirmation bias?

2/14/2008  Goldberg, Caren

```
 1                   C. Goldberg
 2          Q.    What's your methodology for
 3    making that connection?
 4          A.    Well, based on my understanding
 5    or based on my knowledge of the stereotyping
 6    literature, based on what I and other
 7    researchers in the area of stereotypes --
 8    based on the way in which stereotypes have
 9    been defined, Mr. Gorman -- it is almost a
10    semantic issue.
11              And that's why I said I didn't
12    really think it was subject to interpretation
13    because it's really a semantic issue.  Whether
14    you say gut instinct, initial reaction based
15    on my limited information or whether you say
16    based on the stereotype that I have is a
17    semantic issue.
18          Q.    I would think it is anything but
19    semantics.  You are making a very big leap.
20              Are you saying there is studies
21    that show where age stereotypes are more
22    prevalent and you are making a conclusive
23    determination in this case that Mr. Gorman
24    definitively used those stereotypes in
25    terminating Mr. Sullivan; correct?
```

```
1                   C. Goldberg
2          A.    Actually, I think you are kind of
3    putting words in my mouth.  Mr. Gorman stated
4    in his deposition that he had limited
5    information, so he based his gut instincts,
6    his judgment, his -- he used several different
7    words that are synonymous with stereotypes to
8    determine that Mr. Sullivan did not have the
9    energy that was required, that Mr. Sullivan
10   would not be able to cope with the changes
11   that the organization was going through.
12         Q.    Isn't it possible that someone
13   could use those same terms that you say are
14   synonymous with age stereotypes and mean them
15   in a completely different context?
16         A.    In a different context, yes.
17         Q.    Isn't it possible that a person
18   like Mr. Gorman could say he is relying upon
19   things like gut instinct and judgment and
20   things like that and be relying upon things
21   other than Mr. Sullivan's age; isn't that
22   possible?
23         A.    Well, given the content of what
24   it was that he was referring to, those are
25   pretty well-cited age stereotypes.
```

1                C. Goldberg

2    which is a gut instinct, which is an initial

3    reaction, which all of those things that Mr.

4    Gorman -- those words that Mr. Gorman used.

5         Q.    There is nothing in the

6    literature that you have reviewed or authored

7    yourself which says every time a manager makes

8    decisions based on his "gut instinct" or

9    "suggestive judgment," he is necessarily

10   relying upon stereotypes; is that right?"

11        A.    That wouldn't be in the

12   literature.

13        Q.    But it is in your literature in

14   the report.  Are you saying because he used

15   those terminologies, he is necessarily relying

16   upon age stereotypes; isn't a that what you

17   are saying?

18        A.    There is a few things.  I

19   wouldn't call my report the academic

20   literature.  It is based on the academic

21   literature, but I would not call it an

22   academic literature.  This is not something I

23   would submit to peer review journal and say

24   can you -- I am submitting this, you have to

25   pass the rigger of the peer review process.

2/14/2008  Goldberg, Caren

```
1                  C. Goldberg
2          A.    I would have to -- if somebody
3    had themselves as the subject of -- him or
4    herself as the subject of the statement had
5    energy as the object of the statement and had
6    gut instinct, yada, yada, you know the list,
7    as the verb in the statement, it would be by
8    definition of stereotype.
9                  (Recess taken from 1:51 P.M.
10         until 1:57 P.M.)
11         Q.    Dr. Goldberg, I am going to try
12   to simplify this a little bit so we move on to
13   something else.
14                Would you agree that a manager is
15   not necessarily relying upon stereotypes every
16   time he or she uses the term "bits of
17   information"?
18         A.    Yes.
19         Q.    Would you agree that a manager is
20   not necessarily relying upon stereotypes every
21   time he or she uses the term "judgment"?
22         A.    Yes.
23         Q.    Would you agree that a manager is
24   not necessarily relying upon stereotypes every
25   time he uses the term "rapid points of view"?
```

```
 1              C. Goldberg
 2         A.    Yes.
 3         Q.    Would you agree that a manager is
 4    not necessarily relying upon stereotypes every
 5    time he uses the term "bits of information in
 6    my head"?
 7         A.    Yes.
 8         Q.    Would you agree that a manager is
 9    not necessarily relying upon stereotypes every
10    time he uses the term "energy" as a reason for
11    a termination?
12         A.    Yes.
13         Q.    So is it only the combination of
14    all those factors here that led you to the
15    conclusion that Mr. Gorman was terminating Mr.
16    Sullivan because of his age?
17         A.    I would take out the word "only."
18    It is the combination of those factors that
19    led to my -- to my conclusion.
20         Q.    So it is the use of terms "bits
21    of information," "judgment," "rapid points of
22    view," combined with the term "energy" that
23    led you to that conclusion?
24         A.    Combined with the term -- I would
25    say insofar as the term "energy" either refers
```

**2/14/2008  Goldberg, Caren**

```
1                   C. Goldberg

2   correct?

3        A.    Yes.

4        Q.    To make the determination whether

5   the use of energy is based on age-based

6   factors, don't you need to know the facts that

7   led the person to use that term in order to

8   make that determination?

9        A.    Yes.

10        Q.    Are there generally accepted

11   standards for collecting data when you do a

12   report like this?

13        A.    A report like this?

14        Q.    Yes.

15        A.    Like my expert report?

16        Q.    Yes.

17        A.    I have no idea, I have never done

18   one before.

19        Q.    Okay.  So that would be, you

20   don't know whether there are standards or not?

21        A.    Correct.

22        Q.    Okay.  In preparing a report like

23   Exhibit 1, are there generally accepted

24   standards for coding that data?

25        A.    I didn't code any data.
```

**2/14/2008 Goldberg, Caren**

1                    C. Goldberg

2          Q.    Do you normally code data ahead

3     of time?

4          A.    Tell me what you mean by "data."

5          Q.    The facts that you use in this

6     report, do you sometimes prepare a coding

7     manual in advance to say if I find X, it means

8     Y?

9          A.    This is the first time I have

10    done it.  So I didn't do it in this case and

11    obviously it is not a general rule for me,

12    because this is the only case that I have

13    done.

14         Q.    Isn't it generally required when

15    you are making a determination like this, to

16    create a coding manual to prevent any type of

17    subjectivity bias?

18         A.    I have no idea.

19         Q.    To be a reliable report in your

20    field, is it important to rely on more

21    anecdotal data?

22         A.    To be a reliable report?

23         Q.    Yes.

24         A.    When you say "report," are you

25    talking about an expert witness report or are

**2/14/2008  Goldberg, Caren**

```
1                     C. Goldberg
2      the report that you created here to have any
3      sense of reliability, that you have to
4      accurately characterize all the underlying
5      factual data that you set in your report?
6           A.    Can you repeat it?
7           Q.    If you would like a judge and
8      jury to believe your report, would you agree
9      it is important that you accurately
10     characterize the facts as you state them in
11     the report?
12          A.    Yes.
13          Q.    If you would like a judge and
14     jury to believe your report, do you agree it
15     is important that in your report you consider
16     all of the relevant facts that would go into
17     the analysis?
18          A.    I think there is a trade-off
19     between considering all the facts and having a
20     report that a judge and jury would read.
21          Q.    You are not answering the
22     question.
23               Would you agree that for this to
24     be a believable report in front of a judge and
25     jury, that you need to consider all of the
```

1                       C. Goldberg

2    my opinion.

3          Q.    Was there anything in the record

4    that said the reason why Mr. Gorman decided to

5    terminate Mr. Sullivan was because he

6    forum-shopped?

7          A.    No.

8          Q.    So as far as you know, the

9    forum-shopping played no role in the

10   termination decision?

11         A.    Actually, your previous question

12   I never actually completed the answer before

13   you shot the second one out.  But I never

14   fully said, if you recall back we had this

15   little sort of back and forth, I never said

16   that Mr. Gorman was the sole decision-maker in

17   this process.

18         Q.    You don't know definitively one

19   way or the other who the decision-maker was

20   then, correct?

21         A.    I think it was a two-part

22   decision and I think the decision was that the

23   woodshed group was going to put Mr. Sullivan

24   on the chopping block and Mr. Gorman was going

25   to drop the guillotine.

2/14/2008 Goldberg, Caren

```
1                    C. Goldberg
2      there?
3           A.    Yes.
4           Q.    That these additional factors
5      make reliance on age stereotypes more likely,
6      but not necessarily definitive; is that right?
7           A.    Well, as I mentioned before, this
8      goes back to this issue, you know,
9      falsifability, in social sciences you never
10     say 100 percent.  So....
11          Q.    The first factor that you mention
12     is a culture of age-based animus; do you
13     recall writing that?
14          A.    Yes.
15          Q.    And you said on page 18:
16               "Morgan Stanley had a culture of
17          age-based animus."
18               Correct?"
19          A.    I know I said it, I take your
20     word for it that I said it here.
21     Yes.
22          Q.    And you came to the conclusion
23     that Morgan Stanley had a culture of age-based
24     animus based on three quotes you had gotten
25     from certain exhibits you reviewed, correct?
```

```
1                    C. Goldberg

2        A.    Yes.  It is actually my

3   understanding that -- or I came to learn after

4   I wrote my report that there was also some

5   event where, I believe, it was Mr. Brodsky was

6   given a cane for his 40 birthday with a horn

7   on it.

8        Q.    I am going to ask you to limit

9   back into the report here.  In coming to your

10  conclusion that Morgan Stanley had a culture

11  of age-based animus, this is again based on

12  your review of the limited deposition

13  transcripts and exhibits that you reviewed,

14  correct?

15       A.    Correct.

16       Q.    So you feel that you are

17  qualified to make a determination to the

18  culture at Morgan Stanley based on a review of

19  a few transcripts and exhibits?

20            MR. WELZER:  Objection.

21       A.    I think I can make a statement

22  about whether the culture was aegis.  I can't

23  speak to every aspect of the culture, but a

24  culture that let's lines like that go

25  unchecked would be considered aegis, yes.
```

2/14/2008 Goldberg, Caren

1                    C. Goldberg

2    these other documents?

3            A.     I think when you consider the

4    level of the individuals who are making those

5    remarks, yes, I do think it is appropriate

6    because, you know, when you have people, you

7    know, the president and next level or two down

8    making those comments, that creates a culture

9    because, you know, it is very much

10   role-modeled behavior.

11           So the subordinants see this is

12   acceptable and then it becomes part of the

13   culture.

14           Q.     The first comment is:

15                  "'Let's let the old guy get up to

16           the front of the line.'"

17                  Do you remember who made that

18   statement?

19           A.     Not specifically, no.

20           Q.     Was it one of Mr. Sullivan's

21   co-workers, Bill McMahon?

22           A.     I couldn't tell you.

23           Q.     Wasn't it made at a lunch when

24   Mr. McMahon and Mr. Sullivan were at a lunch

25   together?

```
 1                    C. Goldberg
 2          A.    They were on a lunch line, as I
 3    recall it.
 4          Q.    Do you know how old Mr. McMahon
 5    is?
 6          A.    Not off the top of my head.
 7          Q.    If he was around the same age as
 8    Mr. Sullivan and made the comment while the
 9    two of them were hanging out on a buffet line,
10    do you think that comment by a co-worker is
11    indicative of a culture of age-based animus?
12          A.    Just as if I, as a Jewish person,
13    said let's let the Jew get to the front of the
14    line, that would still be indicative of
15    anti-semitic culture.
16          Q.    Just that alone, one co-worker to
17    another?
18          A.    Well, it was heard by everybody
19    on the line.  That was one of the issues, is
20    that there were about 20-some people in line,
21    if I recall correctly.  And it was said so
22    that everybody in the line could hear it.
23          Q.    Do you know why it was said by
24    Mr. McMahon?
25          A.    No.
```

```
 1                      C. Goldberg
 2      conducted your own HR investigations, when
 3      someone -- when an employee makes a complaint,
 4      and they say I have been a victim of some type
 5      of discrimination, do you always take them at
 6      their word?
 7           A.    I have never been involved in an
 8      investigation as an HR manager.
 9           Q.    You haven't, okay.  Well, you
10      commented on the accuracy of the investigation
11      here, but you have never been involved in one
12      yourself, correct?
13           A.    Correct.
14           Q.    The second comment is --
15           A.    Excuse me, actually, let me
16      correct that.  I have never been involved as a
17      manager in sexual harassment.
18           Q.    As opposed to an employee filing
19      the complaint?
20           A.    I don't want you to construe it
21      as me changing my story.
22           Q.    That's fine.  The second comment
23      is:
24                 "'Ed is an old school type
25           manager.'"
```

2/14/2008  Goldberg, Caren

```
 1                     C. Goldberg
 2                Do you remember the context of
 3      that statement?
 4           A.    Not off the top of my head.
 5           Q.    Wasn't it from the deposition of
 6      Rick Sanchez and --
 7           A.    I am fairly certain it was from
 8      Rick Sanchez.
 9           Q.    Let me try to refresh your
10      recollection.  In Mr. Sanchez's deposition he
11      said Mr. John Schaefer had referred to Ed as
12      an old school manager, correct?
13           A.    If I could see the testimony to
14      confirm that, I could confirm that.
15           Q.    Let's just say hypothetically
16      that's where it came from.
17           A.    Okay.
18           Q.    How do you know that that's an
19      accurate statement, that John Schaefer
20      actually said that?
21           A.    Again, all I have to go on is the
22      depositions and sworn testimony.
23           Q.    You are assuming that everybody
24      is being truthful?
25           A.    Yes.
```

1                    C. Goldberg

2         Q.    John Schaefer wasn't deposed in

3    this case that you are aware of, correct?

4         A.    Not that I am aware of.

5         Q.    You never talked with him, you

6    never met with John Schaefer?

7         A.    No.

8         Q.    Do you know if Mr. Sullivan heard

9    this comment?

10        A.    I don't know.

11        Q.    Do you know if anyone other than

12   Mr. Sanchez heard the comment?

13        A.    I don't know.

14        Q.    So it is possible that this

15   comment could have just been between two

16   managers, correct?

17        A.    It is possible.

18        Q.    Okay.  If it is a comment from

19   one manager to another, that no one else is

20   accessible, where one manager says Ed is an

21   old school manager, do you think that comment

22   is indicative of a culture of age-based

23   animus?

24        A.    Certainly could be.

25        Q.    But you are saying here it is,

```
 1                    C. Goldberg

 2          A.    I did get a list, I don't know

 3    off the top of my head.  I do know that Mr.

 4    Sanchez is done, I do know -- that's all that

 5    I remember off the top of my head.

 6          Q.    Mr. Sanchez wasn't a regional

 7    director then.

 8          A.    Yes.

 9          Q.    Do you know who the other

10    regional directors were?

11          A.    Their names were referenced

12    throughout the depositions.

13          Q.    When you were doing your

14    comparison in the report that Mr. Sullivan is

15    being compared to younger individuals, you

16    only cite one regional director when you are

17    saying there is at least seven or eight

18    others, correct?

19                MR. WELZER:  Objection.

20          A.    Can you repeat that?

21          Q.    Sure.

22                By your own testimony, by the

23    way, there were eight regional directors

24    altogether.

25          A.    Thank you.
```

1                    C. Goldberg

2          Q.    Ms. Stilwell was only one of the

3    other seven, correct?

4          A.    That stands to reason.

5          Q.    When you are making a statement

6    about Mr. Sullivan being compared to other

7    individuals, you make no reference to his

8    comparison to all the other regional

9    directors, correct?

10         A.    Ms. Stilwell was the only other

11   one that had -- that fell in the lower side of

12   the nine-cell talent grid.

13         Q.    Okay, but Mr. Gorman is the one

14   doing these interviews, correct?

15         A.    Correct.

16         Q.    There is no evidence in the

17   record that Mr. Gorman even looked at the

18   grids in the performance evaluations, correct?

19              MR. WELZER:  Objection.

20         A.    I am not sure.

21         Q.    You don't know one way or the

22   other?

23         A.    I don't one way or the other.

24         Q.    Are you aware that there were

25   other regional directors that were retained

```
 1                      C. Goldberg
 2      who are older than in other industries in this
 3      report?
 4           A.    No.
 5                 (Discussion off the record from
 6           5:30 P.M.  until 5:31 P.M.)
 7           Q.    Would you say in coming to your
 8      conclusion in your report in this case, that
 9      Mr. Gorman terminated Mr. Sullivan because of
10      his age, it is important to eliminate other
11      possible causes for his termination?
12           A.    No.  That's what I keep saying,
13      is the fact that age was a factor doesn't mean
14      that other things weren't a factor.
15           Q.    Well, could these other factors
16      have caused Mr. Sullivan's termination
17      regardless of his age?
18           A.    Yes.
19           Q.    So, for example, some of the
20      things that Mr. Gorman mentioned in his
21      deposition transcript was that he had
22      consulted with other top executives in the
23      firm about Mr. Sullivan, do you recall that?
24           A.    Yes.
25           Q.    And that he reviewed Mr.
```

1              C. Goldberg

2    Sullivan's compensation numbers and noticed

3    that those had a downward trend, do you recall

4    that?

5          A.    Not specifically.  I am sorry,

6    his -- Mr. Sullivan's total compensation, yes,

7    I do recall that.

8          Q.    Do you recall that Mr. Gorman

9    said that he evaluated Mr. Sullivan based on

10   the interviews that he had with him?

11         A.    Not specifically.

12         Q.    If the report reflects that Mr.

13   Gorman decided to terminate Mr. Sullivan

14   because of his evaluation of him in the

15   interview process, the downward trend in

16   compensation, his evaluation from other top

17   executives, could it be that Mr. Gorman would

18   have come to that decision regardless of Mr.

19   Sullivan's age?

20         A.    It is possible.

21         Q.    Do you have any way of knowing

22   whether Mr. Sullivan's faith would have been

23   different whether he was 55 or another age?

24         A.    I don't.

25         Q.    Isn't it good scientific practice

1              C. Goldberg

2     when you are preparing reports like this, to

3     at least address the other possible causes of

4     Mr. Sullivan's termination?

5          A.    I don't know.  As I mentioned to

6     you several times, this is the first time I

7     have done a report like this.  So I didn't

8     really have anything to go by.

9          Q.    I am just asking you as a

10    long-time professor and having done many

11    studies, when you have a hypothesis that you

12    work on in a report, do you normally explain

13    away other possible causes for the results of

14    your study?

15         A.    I wasn't -- this wasn't a

16    hypothesis.  A hypothesis is an expectation

17    that something is going to -- that things

18    are -- two things are going to be

19    significantly different.  I did not go in with

20    that.  I went in saying okay, I am going to

21    read the depositions and see how I feel at the

22    end of the day.

23         Q.    But you didn't think it was

24    necessary to at least explain why you thought

25    Mr. Gorman's other explanations weren't the

**2/14/2008  Goldberg, Caren**

```
 1                    C. Goldberg
 2    the peer review process?
 3                    MR. WELZER:  Objection.
 4           A.    That's just a weird question.  It
 5    would never go in the peer review process.  So
 6    I wouldn't feel comfortable with it because it
 7    doesn't belong there.
 8           Q.    Why not?
 9           A.    Because it is not the same type
10    of research that goes in peer review journals.
11           Q.    Do you have any way of testing
12    the validity of the conclusions that you
13    reached in this report?
14           A.    I guess this may have been what
15    you were getting at before.  I could submit it
16    to other colleagues of mine that do research
17    in the area of age discrimination and ask them
18    for their feedback.
19           Q.    But is there an objective way
20    that you could check your conclusions for
21    errors that you made?
22           A.    Well, that's objective.
23           Q.    Right.  So this report is
24    completely subjective; is that right?
25           A.    No.
```

**2/14/2008  Goldberg, Caren**

1                    C. Goldberg

2        Q.    Is it possible that another

3    professor could read the same materials that

4    you did and not come to the conclusion that

5    Mr. Sullivan was terminated because of his

6    age?

7        A.    Another professor -- you are

8    going to have to give me a little more.

9        Q.    Is it possible that another

10   professor, like yourself, could review the

11   same exact materials you did and come to the

12   opposite conclusion?

13                MR. WELZER:  Objection.

14       A.    What conclusion?

15       Q.    That Mr. Sullivan was terminated

16   because of his age.

17       A.    Not likely, but possible.

18       Q.    But it is based on the subjective

19   view and analysis of each person who would be

20   reviewing the data, correct?

21       A.    I don't think it is subjective.

22       Q.    If another professor could review

23   and come to the opposite conclusion, how is it

24   not subjective?

25       A.    Even in empirical research,